**Eugene HOLT, Appellant,**

v.

**Donald WYRICK, Warden, Missouri State Penitentiary, Appellee.**

No. 80–2004.

United States Court of Appeals, Eighth Circuit.

Submitted March 12, 1981.

Decided May 14, 1981.

Rehearing and Rehearing En Banc Denied July 1, 1981.

James E. Reeves, Ward & Reeves, Caruthersville, Mo., for appellant.

John Ashcroft, Atty. Gen., Michael Elbein, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before BRIGHT and ROSS, Circuit Judges; and HARRIS, Senior District Judge.*

BRIGHT, Circuit Judge.

Eugene Holt, a Missouri state prisoner, appeals from an order denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Holt's first trial for murder ended in a mistrial. In his second trial, the jury convicted Holt of second degree murder and sentenced him to life imprisonment. The Missouri Supreme Court affirmed Holt's conviction in an extensive opinion written by Judge Seiler. *State v. Holt*, 592 S.W.2d 759 (1980). Holt then filed a petition seeking habeas corpus relief in federal district court,[1] which referred the petition to Magistrate William S. Bahn. In a well-reasoned opinion, Magistrate Bahn recommended dismissal of the petition on all grounds asserted by Holt, and Judge Hungate adopted the magistrate's recommendations in their entirety.

On appeal, Holt renews his assertions:

1) that the state denied him a fair trial because the jury consisted, in part, of bystander veniremen selected by the local sheriff;

2) that the jury had no evidentiary basis for convicting Holt of second degree murder, as a lesser included offense of capital murder;

3) that the evidence supporting his conviction, nothing more than "an incredible story told by a mental defective," was insufficient to convince any rational trier of fact of Holt's guilt beyond a reasonable doubt;

4) that the court deprived Holt of his right to confront and cross-examine witnesses against him by admitting the preliminary hearing testimony of the state's witness, Wanda Sue McAllister;

5) that the state invaded Holt's right to counsel by surreptitiously recording Holt's telephone conversations with witness McAllister prior to trial; and

6) that the state subjected Holt to double jeopardy by retrying him after the first trial judge, *sua sponte*, declared a mistrial when the jury reported a deadlock after a short period of deliberation.

Having fully reviewed the record, we affirm.

## I. *Factual Background.*

The Missouri Supreme Court ably set out the general factual background of the case.

[A]ppellant, thirty-five years old, and his wife operated a small grocery store. Appellant became infatuated with a sixteen-year-old, Wanda Sue McAllister. Early in 1976, they became lovers. Appellant several times said he was going to kill his wife, mentioning drowning her, shooting her, rigging the bathtub so she would be electrocuted, and hiring someone to kill her. Roger Dale Jackson, age twenty, a cousin of Wanda, and not overly bright, testified that appellant offered to pay him $1000 to kill Mrs. Holt and also said he would forget about Jackson's unpaid bill at the grocery store.

The Saturday before the killing appellant took Jackson home with him, showed him the gun to use, and told him that the following Tuesday was the day. On Tuesday afternoon, Jackson met appellant at an agreed location behind a school house. Appellant again took Jackson to the house, gave him a handgun, told him where to wait and how his wife would enter the house, and instructed him to drag the body into the bathroom, douse the clothing and bathroom with lighter fluid, turn on the gas stove and leave. Appellant would attend a basketball

---

* OREN HARRIS, United States Senior District Judge, Western District of Arkansas, *sitting by designation.*

1. The Honorable William L. Hungate, United States District Judge for the Eastern District of Missouri.

game at Neeleyville, some fifty miles or so away, and return after it was all over.

Jackson waited for Mrs. Holt, shot her four times in the back, ran out the back door, went home and told his wife what he had done and hid the gun in the attic. Shortly thereafter Jackson pleaded guilty to second degree murder on the understanding he would receive a twenty-five year sentence and would testify against appellant.

Appellant testified in his own behalf and admitted his infatuation and affair with Wanda McAllister, but denied having anything to do with killing his wife, with having hired Jackson to do so, or taking Jackson to the house. It was appellant's position that Jackson was a border-line mental defective, that he was angry with Mrs. Holt because she had refused him a sandwich and soft drink at the grocery store because of his unpaid bill and that his cousin, Wanda, was the one who persuaded him to shoot Mrs. Holt. [*State v. Holt, supra*, 592 S.W.2d 763.]

## II. *Jury Selection.*

Although the murder occurred in Pemiscot County, Holt's trial took place in New Madrid County after a change of venue. Because the regular panel had been partially depleted, the trial judge ordered the new Madrid County sheriff to select an additional twenty-five jurors. The venire from which Holt's jury was selected consisted of twenty persons from the regular panel and twenty-five supplemental jurors selected by the sheriff.

Holt argues that the sheriff's selection of the supplemental jurors deprived him of a fair trial. Relying on *Ross v. Wyrick*, 581 F.2d 172 (8th Cir. 1978), and *Henson v. Wyrick*, 634 F.2d 1080 (8th Cir. 1980), *cert. denied*, — U.S. —, 101 S.Ct. 1417, 67 L.Ed.2d 383 (1981), Holt argues that a sheriff's selection of jurors is inherently prejudicial because the sheriff's choices likely will mirror the sheriff's bias toward

2. Both the capital and second degree murder charges required the jury to find:

the prosecution and produce a conviction-prone jury.

The Missouri Supreme Court and the federal magistrate properly distinguished *Ross v. Wyrick* as the court in *Ross* addressed the issue of racial discrimination in jury selection. *See State v. Holt, supra*, 592 S.W.2d at 768.

This court's decision in *Henson v. Wyrick, supra*, likewise does not require reversal. In that case, the sheriff, whose subordinates investigated the crime and made the arrest, hand-picked the additional jurors from among his acquaintances. We granted habeas corpus relief because there existed the danger of a "conviction-prone" jury because of the "great potential for the sheriff to hand-pick jurors sympathetic to the prosecution." *Id.* at 1084.

In this case, however, the facts differ significantly from those in *Henson*. First, the sheriff's office in neighboring Pemiscot County, rather than the New Madrid County sheriff's office, conducted the investigation. As the Missouri Supreme Court commented:

Since the sheriff and his deputies were not involved in this case prior to trial, there was no question of the sheriff acting out of loyalty to deputies or on the basis of special knowledge of the facts of the case. [*State v. Holt, supra*, 592 S.W.2d at 768.]

Equally important, Holt presented no evidence that the sheriff selected only his acquaintances for the jury.

Although we express concern with the fundamental fairness in this method of selecting bystander jurors, the record in this case discloses no basis for inferring a deprivation of due process. Accordingly, we reject Holt's contention.

## III. *Second Degree Murder Conviction as Denial of Due Process.*

The trial court instructed the jury on capital murder, second degree murder, and manslaughter.[2] The jury found Holt guilty

1) that the defendant caused the death of his wife by offering to pay Jackson $1,000 to

of second degree murder and sentenced him to life imprisonment. In his petition, Holt challenges the sufficiency of the evidence supporting his conviction on two grounds.

Holt first contends that his conviction for second degree murder violates due process because the jury could not rationally acquit him of capital murder, yet convict him of second degree murder. Holt argues that the state, consistent with the requirements of capital murder, attempted to prove that he deliberately planned the murder of his wife by hiring Jackson to kill her and that the jury, by acquitting him of capital murder, rejected the heart of the prosecution's case.

The Missouri Supreme Court rejected this claim. *State v. Holt, supra,* 592 S.W.2d at 764. The court reasoned that the jury accepted the state's evidence, but decided to convict him of second degree murder as a matter of leniency. The court concluded that "the jury had a right to convict on either the capital murder or second degree murder charge, provided there was evidence before the jury to support such a conviction." *Id.* This conclusion rests on the state court's interpretation of the Missouri murder statutes. We are thus not faced with an issue cognizable in a federal habeas corpus petition, as long as the state introduced sufficient evidence to support the second degree murder conviction. *See Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979); *Davis v. Campbell,* 608 F.2d 317, 319 (8th Cir. 1979).

Holt also contends that his conviction rested on insufficient evidence because no rational trier of fact could have believed the testimony of Roger Jackson. Holt characterizes Jackson as a "mentally defective" murderer whose testimony was "impeached by every conceivable means recognized by law." [3] The trial court found Jackson to be of sound mind and competent to testify. The state's medical expert disputed Holt's evidence and concluded that Jackson was not mentally retarded. As the magistrate reasoned, "[e]ven if we concede that Jackson was not the best witness," the other evidence of Holt's guilt was strong and convincing. In addition to Jackson's testimony that Holt offered him money and a gun to kill Mrs. Holt, the state presented corroborative evidence of Holt's participation in the crime. Wanda Sue McAllister and Margaret Jackson testified that Holt repeatedly expressed his intention to kill his wife. McAllister also confirmed Holt's specific plan to hire Jackson to kill Mrs. Holt. From our independent review of the record, we conclude that the Missouri Supreme Court correctly ruled that sufficient evidence supported the conviction of second degree murder. Holt's conviction, therefore, does not violate due process.

### IV. *Wanda Sue McAllister Evidence.*

The state promised Wanda Sue McAllister immunity from prosecution for Mrs. Holt's murder if she "would cooperate with the State." This short-lived cooperation produced two pieces of evidence: (1) McAllister's testimony at Holt's preliminary hearing; and (2) tape recordings of telephone conversations between Holt and McAllister. Holt asserts that the use of this evidence at his trial violated his rights under the sixth amendment as applied to the states through the fourteenth amend-

kill her and by providing Jackson with a handgun;

2) that the defendant intended to take Patricia Holt's life; and

3) that the defendant acted either alone or knowingly and with common purpose together with one or more in the commission of the unlawful acts.

The capital murder instruction contained two additional elements:

1) that the defendant knew that he was practically certain to cause the death of Patricia Holt; and

2) that the defendant considered taking the life of Patricia Holt and reflected upon this matter coolly and fully before doing so. In order to find second degree murder the jury had to find the absence of provocation.

3. As impeachment evidence, Holt points to Jackson's IQ of 59, Jackson's plea-bargained testimony, and Jackson's admission that he gave three inconsistent versions of the murder, including a denial of participation in the murder.

ment. *See Ohio v. Roberts*, 448 U.S. 56, 62, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980).

### A. *Preliminary Hearing Testimony.*

Wanda Sue McAllister testified at Holt's preliminary hearing. At trial, however, she exercised her fifth amendment privilege against self-incrimination and refused to testify. The trial judge ruled McAllister unavailable after she refused, during two *in camera* examinations, to answer questions about the murder. McAllister stated that she would persist in exercising her fifth amendment privilege to the point of going to jail for contempt. The trial judge then permitted the state to introduce into evidence McAllister's preliminary hearing testimony. Holt argues that the admission of this testimony at his trial violated his right to confront and cross-examine the witnesses against him.[4]

The confrontation clause guarantees the right to confront and cross-examine an accuser, face-to-face, at trial. *Ohio v. Roberts, supra*, 448 U.S. at 63 & nn.5 & 6, 100 S.Ct. at 2537 nn.5 & 6. Although the Supreme Court has acknowledged that "it is this literal right to 'confront' the witness at the time of the trial that forms the core of the values furthered by the Confrontation Clause," the Court has also recognized that confrontation clause values may be adequately protected under the rules governing the admission of hearsay evidence.[5] *Id.*, 448 U.S. at 63 n.5, 100 S.Ct. at 2537 n.5, 2539

(*quoting California v. Green*, 399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970)).

In *Ohio v. Roberts, supra*, the Supreme Court formulated a two-part test for determining whether the confrontation clause bars the introduction of admissible hearsay in a criminal trial. "First, in conformance with the Framer's preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case * * *, the prosecution must * * * demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." *Id.* 448 U.S. at 65, 100 S.Ct. at 2538. Once a witness is shown to be unavailable, the confrontation clause sanctions the use of prior testimony only if sufficient "indicia of reliability" or "requisite safeguards" existed at the time the testimony was given. *Phillips v. Wyrick*, 558 F.2d 489, 494 (8th Cir. 1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978). *See also Ohio v. Roberts, supra*, 448 U.S. at 66, 100 S.Ct. at 2539. The "indicia of reliability" assure that "the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement." *California v. Green, supra*, 399 U.S. at 161, 90 S.Ct. at 1936.

On the first prong of the test, the record shows that McAllister was unavailable because she invoked her fifth amendment privilege and refused to testify. *See Phillips v. Wyrick, supra*, 558 F.2d at 494.

---

**4.** McAllister's preliminary hearing testimony disclosed:

> (1) her meretricious relationship with Holt, including hotel locations, gifts, and wedding plans; (2) her knowledge of Holt's plans to drown, electrocute, or shoot his wife; (3) her knowledge of Holt's plans to hire Jackson to kill Holt's wife, including Holt's basketball alibi; and (4) Holt's attempt to induce her to change her trial testimony. The cross-examination of McAllister by Holt's counsel focused on: (1) her status as an unwed mother; (2) her failure to notify law enforcement officials of the murder plans; (3) her ambivalence towards Mrs. Holt's murder; (4) her impecuniousness; (5) her instructions to Jackson on how to carry out the murder; (6) her failure to talk Jackson out of the murder; and (7) her knowledge of Jackson's anger at Mrs. Holt for cutting off his credit at the store.

**5.** The Court has not attempted to "map out a theory of the Confrontation Clause that would determine the validity of all * * * hearsay 'exceptions' * * *." *California v. Green*, 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970). Rather, the confrontation clause requires a case-by-case analysis to determine whether the application of an exception to the hearsay rule comports with the sixth amendment. *United States v. Kelley*, 526 F.2d 615, 620 (8th Cir. 1975), *cert. denied*, 424 U.S. 971, 96 S.Ct. 1471, 47 L.Ed.2d 739 (1976). *Compare Ohio v. Roberts, supra*, 448 U.S. at 66 & n.8, 100 S.Ct. at 2539 & n.8 (certain hearsay exceptions, such as dying declarations or prior trial testimony, rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection").

On the second prong, we conclude that McAllister's preliminary hearing testimony possesses the same indicia of reliability as prior testimony which the Supreme Court has previously held admissible. In *Ohio v. Roberts, supra,* the Court held that the "accoutrements of the preliminary hearing itself" justified the introduction into evidence of the preliminary hearing testimony of a witness who is unavailable at the defendant's subsequent criminal trial. *Id.* 448 U.S. at 73, 100 S.Ct. at 2542. *Accord, California v. Green, supra,* 399 U.S. at 165, 90 S.Ct. at 1938. Holt presents no basis to distinguish his case from *Roberts* or *Green.*[6] Accordingly, we hold that the trial court's admission of the preliminary hearing testimony did not deprive appellant of his right of confrontation.

### B. *Evidence Obtained from Tape Recordings.*

After Holt's preliminary hearing, the prosecution, despite its knowledge that Holt was represented by counsel, contacted Wanda McAllister for the purpose of installing a wiretap on her telephone. Although McAllister "didn't want to make the recording," state officials told her "to make it or else." The prosecuting attorney told her that "he wanted enough on [the recording] to convict [Eugene]." Two highway patrolmen installed the wiretap, instructing McAllister not to call Holt, but to have him talk about the case when he called her.

After learning of the wiretap, Holt moved to suppress the tape recordings on the ground that they were obtained in violation of his right to counsel as guaranteed by the sixth and fourteenth amendments. This motion was denied. The prosecution did *not* introduce this evidence in the state's case-in-chief. The prosecutor, however, apparently relied on information from the tapes in formulating his cross-examination of Holt.[7]

Holt argues that the state, in procuring the tape recordings, "intentionally [created]

6. Holt also contends that he was deprived of the opportunity to cross-examine McAllister concerning events occurring after the preliminary hearing. We reject this argument because these later events do not concern the murder and had no effect on the reliability of the preliminary hearing testimony. In addition, Holt had an adequate opportunity to question McAllister about these events at a pretrial suppression hearing.

7. Mr. HAZEL [Prosecutor]: Q. Mr. Holt, on the evening of your wife's murder did you call Wanda McAllister and tell her "Tonight's the night."? A. No, sir, I did not.
Q. Did you tell Wanda McAllister that you were going south after the trial?
MR. REEVES [Holt's attorney]: To which we object, Your Honor, for the reasons previously stated.
THE WITNESS: No, sir, I did not.
THE COURT: Overruled.
MR. HAZEL: Q. Did you tell Wanda McAllister that you would never go to prison for murder?
MR. REEVES: Same objection, Your Honor.
THE COURT: Overruled.
THE WITNESS: I don't remember ever telling her that.
MR. HAZEL: Q. Is it possible you could have told her that?
A. Well, I suppose it's possible a comet could fall out of the sky and hit this buildin', Mr. Hazel. I, I suppose. I, I just don't remember sayin' it though.
Q. Did you tell Wanda McAllister that you were going to deny going out with her?
MR. REEVES: To which we object, Your Honor, same grounds.
THE COURT: Overruled.
THE WITNESS: Repeat the question, sir.
MR. HAZEL: Q. Did you tell Wanda McAllister that you were going to deny going out with her?
A. Not that I remember I didn't tell her I was going to deny going out with her.
Q. Where have you been living since your wife's murder?
A. At Bragg—
MR. REEVES: To which we—Go ahead.
THE COURT: Just a second.
MR. REEVES: That's all right. Go ahead.
THE WITNESS: At Bragg City, Missouri.
MR. HAZEL: Q. And who do you live with, if anybody?
A. I live by myself.
Q. Did you tell Wanda McAllister that you were laying your life on the line for her?
MR. REEVES: To which we object, Your Honor, on the same grounds.
THE COURT: Overruled.
THE WITNESS: I don't remember telling her that. I, I don't remember it.
MR. HAZEL: Q. Did you tell Wanda McAllister that if you had enough money you would go off to Argentina with her?

a situation likely to induce [him] to make incriminating statements without the assistance of counsel[.]" *United States v. Henry*, 447 U.S. 264, 274, 100 S.Ct. 2183, 2189, 65 L.Ed.2d 115 (1980). *See also Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Holt asserts that the state's conduct, in forcing Ms. McAllister to record her conversations with Holt, cannot be distinguished from that in *Massiah* where a coconspirator's surreptitious recording of conversations with the defendant amounted to unconstitutional interrogation in violation of the sixth amendment. *See id.* at 202–03, 84 S.Ct. at 1201.

■ Assuming that the prosecutor interfered with Holt's right to counsel, we deem the error harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The state did not introduce the tapes into evidence. Much of the cross-examination in question related to Holt's relationship with McAllister, a relationship conceded to by the defense. Further, the prosecution presented substantial evidence of Holt's guilt in the state's case-in-chief.[8] As we

stated in *United States v. Weir*, 575 F.2d 668 (8th Cir. 1978), "If, upon the record as a whole, this court is certain that the [use] of the evidence did not influence the jury, or had but a slight effect, the verdict should stand." *Id.* at 671. Under the circumstances of this case, we conclude that the information derived from the tape recordings, at most, slightly affected the outcome of the case. We thus hold that any error resulting from the state's alleged unconstitutional behavior is harmless beyond a reasonable doubt.

## V. *Double Jeopardy.*

Appellant contends that the state unconstitutionally subjected him to double jeopardy by retrying him after his first trial ended in a mistrial. In Holt's first trial, the jury began its deliberations at 11:15 p. m. and returned to the courtroom at 12:35 a. m. At that time, the jury informed the court that "we have a hung jury." The trial judge then asked the foreman to indicate the jury's numerical division, "[w]ithout telling me how the vote is." In response, the foreman blundered by informing the court that nine jurors favored conviction.[9] The trial judge then declared a

---

MR. REEVES: To which we object, Your Honor, on the grounds previously stated.
THE COURT: Overruled.
THE WITNESS: I don't remember ever telling her we were gonna go to Argentina, no, I don't remember it.
MR. HAZEL: Q. Didn't you tell Wanda McAllister that if Roger Jackson testified about you showing him your house you would deny it?
MR. REEVES: To which we object, Your Honor, on the grounds previously stated.
THE COURT: Overruled.
THE WITNESS: I'm sorry, you'll have to repeat the question, sir.
MR. HAZEL: Q. Didn't you tell Wanda McAllister that if Roger Jackson testified about you showing him your house you would deny it?
A. I don't remember telling her that.
Q. Didn't you tell Wanda McAllister that if she was prosecuted you'd find her a lawyer that would stop it?
MR. REEVES: To which we object, Your Honor, on the grounds previously stated.
THE COURT: Overruled.
THE WITNESS: I don't remember ever telling her that either.

8. Because we deem any error harmless beyond a reasonable doubt, we need not reach the question whether the tapes seized in violation of the sixth amendment may be admissible for impeachment purposes. *Compare United States v. Havens*, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (evidence suppressed as fruit of unlawful search may be used to impeach a defendant's false trial testimony).

9. The record reveals the following scenario:
THE COURT: Ladies and gentlemen of the Jury, the Bailiff tells me that you wish to come back into the Court Room. Mr. Schuerenberg, are you the Foreman of this Jury?
MR. SCHUERENBERG: Yes, sir.
THE COURT: Are you back in here with a Verdict or back in here for some other reason?
MR. SCHUERENBERG: We have a hung Jury.
THE COURT: Without telling me how the vote is, give me the numerical division, if you will, please.

mistrial after his poll of the jury confirmed the foreman's report of the deadlock.

■ After a mistrial has been declared, *sua sponte*, by the first court, the state may retry a defendant if it can convince the reviewing court that the mistrial resulted from a "high degree" of necessity. *Arizona v. Washington*, 434 U.S. 497, 506, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978); *United States v. Perez*, 22 U.S. (9 Wheat.) 6579, 6 L.Ed. 165 (1824) ("manifest necessity" test first enunciated).[10] The inability of the jury to reach a verdict has long been considered the "classic basis for a proper mistrial." *Arizona v. Washington, supra*, 434 U.S. at 509, 98 S.Ct. at 832. Indeed, the Supreme Court recently stated that a reviewing court should accord deference to a trial judge's decision to declare a mistrial when he considers the jury deadlocked. *Id.* at 510, 98 S.Ct. at 832. To protect the defendant's "valued right to have his trial completed by a particular tribunal," *United States v. Jorn*, 400 U.S. 470, 484, 91 S.Ct. 547, 556, 27 L.Ed.2d 543 (1971), however, "reviewing courts have an obligation to satisfy themselves that * * * the trial judge exercised 'sound discretion' in declaring a mistrial." *Arizona v. Washington, supra*, 434 U.S. at 514, 98 S.Ct. at 834.

Holt's first trial judge found himself in the unenviable position of balancing Holt's right to have his trial completed before the original jury against the strong policy of protecting the jury from judicial coercion. As the Missouri Supreme Court explained,

[t]he appellant could, with justification, contend that sending the jury back at 12:45 or 1:00 o'clock in the morning, when the judge knew they were nine to three for conviction, was a tactic to give the state more leverage to convict the appellant. It would be different if the judge knew only that the jury stood nine to three, because then his attempt to bring about a verdict by requiring further deliberation would be made without the court's knowing which side would likely be the beneficiary of his action. Under the circumstances before him, the only way the court could avoid showing favoritism to the state was to declare a mistrial. His action was not over hasty or rash. [*State v. Holt, supra*, 592 S.W.2d at 772.]

■ Here then, the jury realized that the trial judge knew that the nine jurors stood for conviction. To send the jury back to deliberate would inherently serve to coerce the minority to agree with the majority on conviction. Thus, we must conclude that the declaration of the mistrial resulted from "manifest necessity," and Holt's second trial does not offend the constitutional prohibition against double jeopardy. *See Nelson v. District Court*, 543 F.2d 631, 632 (8th Cir. 1976) (*per curiam*). *See also Mullin v. Unit-*

---

MR. SCHUERENBERG: Nine guilty—

THE COURT: No, don't tell me which way you stand, just tell me the numerical division, six and six or—

MR. SCHUERENBERG: Nine and three.

THE COURT: Nine and three?

MR. SCHUERENBERG: Yes, sir.

THE COURT: How long has your Jury been at nine and three?

MR. SCHUERENBERG: Oh, the last hour and a half.

THE COURT: Well, you have been out there an hour and thirty-five minutes. Have you been that way—

MR. SCHUERENBERG: We gained one in the last little bit. Gained one and lost one, whichever way you want to put it.

THE COURT: Do you feel like there is any possibility of reaching a verdict?

MR. SCHUERENBERG: No, sir, I sure don't. I don't think there is any chance.

[The polling of the jury followed this exchange.]

**10.** If the defendant requests or consents to a mistrial, the manifest necessity test does not apply. Unless the underlying error is attributable to prosecutorial misconduct or judicial overreaching, the defendant's consent to a mistrial ordinarily removes any barrier to reprosecution. *Lee v. United States*, 432 U.S 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977); *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976); *United States v. Martin*, 561 F.2d 135, 138–39 (8th Cir. 1977). The state argues that the defendant impliedly consented to a mistrial when his counsel failed to object to the *sua sponte* mistrial ruling of the first court. In light of our decision, we need not address the state's claim that his failure to object constituted a waiver of the former jeopardy plea.

*ed States*, 356 F.2d 368, 370 (D.C.Cir.1966) (Burger, J.) (mistrial resulting from jury's volunteering its division on guilt no bar to second trial, regardless of claimed deadlock).

Because we conclude that each of Holt's claims lacks merit, we affirm the district court's denial of habeas corpus relief.