**UNITED STATES of America, Appellee,**

v.

**Douglas John KNIGHT, also known as Justin Knight, Appellant.**

No. 94–2767.

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1995.

Decided June 30, 1995.

Rehearing Denied Aug. 7, 1995.

Gerald M. Handley of Kansas City, MO, argued, for appellant.

Barbara E. Guss, Asst. U.S. Atty., White Plains, NY, argued (Lisa M. Smith, Asst. U.S. Atty., Kansas City, MO, on the brief), for appellee.

Before WOLLMAN, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and LOKEN, Circuit Judge.

* The HONORABLE DANIEL M. FRIEDMAN, Senior United States Circuit Judge for the Feder- al Circuit, sitting by designation.

WOLLMAN, Circuit Judge.

Douglas John Knight appeals his conviction on three counts related to an extortion scheme. Knight's chief contentions are that a juror holding out for acquittal on one count was improperly coerced and that Knight's consent to search a hotel safe deposit box was improperly obtained. We affirm.

## I

Knight was convicted of two extortion-related counts under 18 U.S.C. § 875(d) and § 1951, and one count of money laundering under 18 U.S.C. § 1957. He was sentenced to concurrent terms of 24, 40, and 46 months of imprisonment.

Knight alleges that he was the unwitting beneficiary of an anonymous grateful friend who threatened to tamper with Pepsico, Inc. food products unless Pepsico paid Knight $350,000. This scheme was laid out in a letter from this unknown person to Pepsico. The company immediately contacted the FBI, and under FBI surveillance telephoned Knight. Knight told Pepsico that he knew nothing about the payoff scheme. Knight allegedly then received several calls from two unidentified persons claiming association with his nameless benefactor. Knight passed on to Pepsico some instructions and explanations from these unknown callers. Knight himself took an active part in arranging the details of the money delivery, and he ultimately negotiated the Pepsico check before his arrest that same day.

· Knight claims that he did not know of the extortion scheme despite his extensive telephone and written contacts with Pepsico concerning the payoff. However, there is telephone transcript evidence showing that Knight by the end at least knew that Pepsico had been threatened in some way.

After a five-day trial, the jury deliberated for one day before notifying the district court[1] that verdicts had been reached on the two extortion counts. Over the government's objection, the district court decided to take the verdicts before sending the jury home for the night rather than wait for the third count to be resolved. Guilty verdicts were returned, and the jury was polled without event.

The next morning, one juror refused to reenter the jury room. In a conference in chambers, this juror said that she felt intimidated by her fellow jurors. She said that she regretted her guilty votes of the day before and that she was the lone holdout for acquittal on the remaining count. (The district court had unsuccessfully cautioned the juror to voice her concerns in general terms.) The juror said further deliberations would not change her mind, and in effect requested discharge.

Upon returning to the courtroom, the district court instructed the jury to resume deliberations:

> The reason for calling you to the courtroom is to emphasize the need for the members of the jury to be courteous to each other and to listen to what other members of the jury say and believe, and I think that I would understand that there was a member of the jury who did not join you this morning and reported that she felt some hostility or unhappiness in the jury room.
>
> This is not an unusual situation. You are working on important matters that deal with serious criminal charges. You are also dealing with important matters that deal with the life of an individual defendant, and I would understand how people might get somewhat emotional about a case.
>
> We don't usually know what goes on in the jury room, but there are lots of stories that come out where members of the jury are extremely discourteous to each other to say the least, and that hostility breaks out and that sort of thing.
>
> You should all try to get past any sense of being unhappy with each other or with someone on the jury, and you should continue your deliberations with courtesy . . . .
>
> . . . .

---

1. The Honorable Howard F. Sachs, Senior United States District Judge for the Western District of Missouri.

I do urge you that any sense of hostility or any bad words that may have been exchanged, that you forget about that, and that you go about your business in an orderly way recognizing that all members of the jury have a duty to try to analyze the case as best they can and to follow their conscience in deciding the case.

So I will ask the jury to return to the jury room at this time and resume your deliberations on the last count. I again perhaps ought to emphasize to you this is not a startling, unique situation that has arisen. One does hear about this sort of thing.

. . . .

I would ask that you now resume your deliberations. Of course, we will await any further notes or requests, or suggestions from the jury or from any member of the jury. If any of you wishes to send in a note, it will be considered in the formal way that all other notes have been considered.

Some four to five hours after deliberations resumed, the jury returned a unanimous verdict of guilty on the money laundering count. A poll showed the verdict to be unanimous, and the district court individually confirmed the holdout juror's guilty vote in a chambers conference, where defense counsel had an opportunity to question the juror.

## II

■ The trial court has the discretion to declare a mistrial when it learns that a deadlocked jury is leaning heavily to convict. This is because of the risk that holdouts will feel that the judge has instructed them to convict if a resumption of deliberations is ordered. *See United States v. Sae–Chua,* 725 F.2d 530, 532 (9th Cir.1984); *Holt v. Wyrick,* 649 F.2d 543, 551 (8th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982). Mistrial is not mandated, however. Circumstances—especially the nature of any supplemental jury instructions given after the court learns the exact split—may show that jurors in the minority were not unduly coerced. *See United States v. Green,* 962 F.2d 938, 943–44 (9th Cir.1992) (supplemental instruction not coercive compared to *Sae–Chua* instruction); *United States v. Kramer,* 955 F.2d 479, 488–89 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992); *United States v. Norton,* 867 F.2d 1354, 1365–66 (11th Cir.), *cert. denied,* 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 701 (1989); *United States v. Dorsey,* 865 F.2d 1275, 1277–79 (D.C.Cir.), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 603 (1989); *United States v. Sblendorio,* 830 F.2d 1382, 1389 (7th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988); *United States v. Cook,* 663 F.2d 808, 810 (8th Cir.1981); *cf. Cornell v. Iowa,* 628 F.2d 1044, 1048 (8th Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 944, 67 L.Ed.2d 112 (1981).

■ Here, the supplemental instruction given after the district court learned the identity of the holdout was not coercive. It in no way suggested that a verdict was necessary, nor did it suggest that the jurors should surrender conscientious positions in light of the views of other jurors. The instruction spoke more to the style rather than to the substance of the deliberations. The charge at issue here was simply not of the potentially intimidating *Allen* type (*Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). *See Green,* 962 F.2d at 944; *Kramer,* 955 F.2d at 489; *Norton,* 867 F.2d at 1365. Jury duty can be unpleasant, but difficult, one-sided debate in the jury room does not require a mistrial. "[I]ndividual jurors have no right to be released from their colleagues' efforts at persuasion." *Dorsey,* 865 F.2d at 1279.

Other circumstances also point to the conclusion that the lone holdout was not subject to undue pressure either from the judge or other jurors. After the jury received the supplemental instruction discussed above, deliberations resumed at 9:45 a.m. Shortly thereafter, the holdout again asked by note to be discharged; the district court responded by note to the holdout juror that it would consider discharging the jury in early afternoon if no verdict was reached by then. Despite this explicit indication by the court that discharge would be considered in early afternoon, the verdict was returned at 2:20 p.m.

with no intervening communication from the holdout.

Yet another factor to be taken into account in considering whether the district court erred in ordering continued deliberations is that both discharge requests were made by the holdout individually; neither the jury as a whole nor the jury foreman ever indicated that agreement was impossible. *See Green,* 962 F.2d at 944; *Norton,* 867 F.2d at 1364; *Dorsey,* 865 F.2d at 1279; *Holt,* 649 F.2d at 550–51 & n. 9.

In our view, the chambers conference held to insure that the former holdout had voted her conscience rather than having succumbed to pressure from her peers removes any doubt regarding the integrity of the jury deliberations.[2]

We find no merit in Knight's argument that the holdout juror was coerced by the district court's decision to send in to the jury a transcript of one witness's testimony. Knight points out that the jury unsuccessfully sought this transcript on the first day of deliberations, before the holdout juror revealed the jury split to the court and asked for discharge. From this, Knight argues that the court's decision to send in the transcript once deliberations resumed must have been intended to give the majority ammunition to coerce the holdout. Even if we assume that the holdout juror was not among those who wished to review the transcript, Knight's argument fails. Knight ignores the fact that the testimony at issue had not yet been transcribed when first requested by the jury. The record shows that the transcript was given to the jury as soon as it was delivered to the court early on the second day of deliberations.

### III

██ Knight contends that once he invoked his *Miranda* rights by asking to talk to his lawyer, his previous consent to a search of his hotel safe deposit box was vitiated and the arresting officials could not renew their request for permission to search without counsel present. In assessing the legality of a consent to search, the voluntariness of the criminal suspect's consent is the key. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225–28, 93 S.Ct. 2041, 2046–48, 36 L.Ed.2d 854 (1973). In determining voluntariness, all circumstances of the consent must be examined. *See United States v. Martin,* 28 F.3d 742, 745–46 (8th Cir.1994). The reading of *Miranda* rights in some circumstances tends to show that any subsequent consent to search by the person in custody is voluntary. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047–48. In a similar vein, the Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel, but there is no similar prohibition on securing a voluntary consent to search for physical evidence. *Cody v. Solem,* 755 F.2d 1323, 1330 (8th Cir.), *cert. denied,* 474 U.S. 833, 106 S.Ct. 104, 88 L.Ed.2d 84 (1985).

██ The facts show that after invoking his right to counsel, Knight voluntarily reinstat-

---

2. The conference in pertinent part went as follows:

> THE COURT: [Juror], you have expressed the view this morning that you had felt some pressure, mental coercion or something, and then I believe during the morning you had indicated by note that you still thought that the jury should be discharged and that it would not be possible to reach a verdict.
>
> Have you honestly reconsidered and is this your view at this time on this particular charge of the money laundering charge, or have I confused you?
>
> JUROR []: I am very unhappy with the verdict, but after going over the testimony [of the defendant's lawyer at the time of the offense] it appeared that there were some discrepancies so I had to question whether or not

he was fully advised of all his circumstances before providing advice to the defendant. On that basis, I—

> THE COURT: You are not happy that the defendant is convicted, but you do join in this, you think the facts are properly decided here?
>
> JUROR []: Yes, Your Honor.
>
> . . . .
>
> [DEFENSE]: Well, it was my understanding this morning that you had felt that you were the subject of pressure or intimidation. Can you tell us whether or not you feel that with regard to this verdict on Count Four?
>
> JUROR []: Well, I did undergo a lot of scrutiny and, yes, I did feel very pressured to make the decision. But at the same time, there were a few things that we had to decide the way we did.

398

ed his consent to search the safe deposit box. The suppression hearing reveals no signs of hesitation by Knight in giving this consent. Knight was in the hotel lobby, a place where any coercion would have been witnessed by the public and hotel staff. The FBI agents testified that Knight gave the hotel manager his consent that the box be searched. At trial, the hotel manager testified as to the hotel's safe deposit box procedures; yet defense counsel (present counsel did not represent Knight at trial) chose not to cross-examine on the issue of Knight's consent to open the box. The circumstances as a whole show that Knight's consent to search the box was voluntarily given.

## IV

 Knight contends that the district court failed to consider a downward departure based on Knight's diminished mental capacity. Failure to depart downward is reviewable only if the district court did not realize that it had the discretion to consider a downward departure. *United States v. Bieri*, 21 F.3d 811, 817 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 208, 130 L.Ed.2d 138 (1994). The district court here clearly understood that it had discretion to depart downward, and it considered this option before rejecting it in favor of a sentence having a greater deterrent effect.

■ Knight also contends that there was insufficient evidence to convict. We do not agree. The evidence in this case is overwhelming that Knight at the minimum knowingly joined an extortion plot in midstream. Knight was observed picking up and reading mail from Pepsico dealing with the extortion; while in Missouri, Knight repeatedly talked or negotiated over the phone with a Pepsico vice-president in New York; and Knight clearly engineered the mechanics of the check delivery to the hotel, then personally received and negotiated the ill-gotten check. Although the district court indicated it had doubts as to whether Knight initiated the extortion, the evidence leaves no doubt that by the time Knight took the actions just mentioned he at the very least knew that Pepsico had been threatened in some way by an unknown person. In sum, Knight knew

an extortion scheme was afoot and worked to bring it to fruition.

■ There is likewise no merit to Knight's contention that the search of the hotel suite where Knight was arrested and the seizure of documents found there was unreasonable. The FBI agents had a valid arrest warrant, as well as fresh evidence of Knight's involvement in an ongoing crime. The agents conducted no extensive search of the suite; the documents seized were in plain view on a tabletop within Knight's reach at the moment of arrest. Thus, the seizure was incident to Knight's lawful arrest.

The judgment is affirmed.