**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sam QAOUD; Evan H. Callanan, Sr.;**
**Evan H. Callanan, Jr.,**
**Defendants-Appellants.**

**Nos. 83-1729, 83-1730 and 83-1757.**

United States Court of Appeals,
Sixth Circuit.

Argued June 3, 1985.

Decided Nov. 21, 1985.

Carl P. Ranno, Birmingham, Mich., Nicholas Smith, argued, Southfield, Mich., Court appointed, for defendants-appellants.

Leonard R. Gilman, U.S. Atty., Detroit, Mich., Sheldon N. Light, Joseph E. Papelian, argued [Lead Counsel], for plaintiff-appellee.

Before WELLFORD and MILBURN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.*

WELLFORD, Circuit Judge.

Defendants, Sam Qaoud, Evan Callanan, Sr. and Evan Callanan, Jr., appeal their convictions on various counts charged in a seven count indictment after a jury trial in the Eastern District of Michigan.

The charges stemmed from evidence of the defendants' improper kickback schemes in exchange for judicial favors from state judge Callanan (Evan Callanan, Sr.). Qaoud was presented at trial as the "bag man" for Judge Callanan. The younger Callanan allegedly served as an informal negotiator for his father and also directed a case through his own law firm.

All of these defendants were convicted of conspiracy to violate RICO (Count I) and substantive violations of RICO (Count II). Callanan, Jr. was convicted of three counts

---

* Honorable Harry Phillips attended the oral argument in this case but did not participate in this decision due to his untimely death August 3, 1985.

of mail fraud (Counts IV–VI) and Callanan, Sr. was convicted on one count (Count VI). Callanan, Jr. was also convicted of obstructing a criminal investigation (Count VII). In a separate indictment joined for trial with the RICO charges. Callanan, Jr. was also convicted of making false declarations before a grand jury.

Callanan, Sr. received concurrent sentences of ten years each on the RICO charges and five years on the mail fraud charge. Callanan, Jr. received concurrent sentences of eight years each on the RICO charges and five years on the other counts. Qaoud received concurrent sentences of three years on the RICO counts.

The evidence produced at trial may be placed in separate categories. The first five categories concerned five separate criminal matters which, according to the government, were "fixed" through the abuse of Callanan Sr.'s power as a judge of the 18th District Court for the State of Michigan. The sixth category involved the attempted "cover-up" once the defendants became suspicious of the government's investigation.

The government was initially tipped off by an informer about kickback scheme "fixes" dealing with liquor and traffic offenses in Judge Callanan's court. The government arranged for the informant (Hanna Judeh) to contact defendants and introduce them to people who might desire to arrange "fixes" within Judge Callanan's jurisdiction, including some involved in cases from the outstanding warrants file of Callanan, Sr.'s judicial district. The plan also sometimes required government agents to assume the identity of these persons in legal difficulties. Many of the conversations with members of the conspiracy were electronically monitored and/or tape recorded.

The defendants do not challenge the use of the electronic evidence on appeal. They also do not seriously dispute the various government recitations of evidence from these sources, which are outlined herein.

## 1. KAROL GOLOB

The first "sting" operation that the government arranged after learning from informant Judeh about the alleged fix-kickback scheme concerning Judge Callanan involved Karol Golob ("Golob"). The local police department cooperated with the federal investigation by providing information about a seven-year old drunk driving charge still outstanding against Golob. An FBI agent then assumed the fictitious identity of Golob's purported brother-in-law, "John Izzy."

Judeh connected undercover agent "Izzy" with the defendant Qaoud to fix the ticket. On October 8, 1980, at a tape recorded meeting, Qaoud stated that the matter could be fixed for $500 and part of this sum would go to the judge. Qaoud demanded that half be paid in advance and half after Golob's record was cleared and the case dismissed. A week later "Izzy" met with Qaoud and paid him $250. Qaoud appeared at Judge Callanan's court a few days later on October 21. The judge dismissed the citation that day, and the warrant was recalled two days later. On October 22, Izzy paid Qaoud the balance of the $500. Qaoud gave Izzy a document that would clear Golob's record at the Michigan Secretary of State's office.

## 2. FAHEL ABDEL–HAMID MAKKI

During his conversation with agent "Izzy" on October 21, Qaoud mentioned an actual criminal matter that he was also going to fix at Judge Callanan's court that day. This involved the case of Reda Makki, who had received a citation for furnishing alcohol to a minor. Surveillance revealed that Qaoud met with Reda Makki's brother, Hussein Makki, as they entered the court that day. Through another contact, Reda Makki had passed $200 on to Qaoud. As they entered the court, Makki presented the ticket to Qaoud. He reported back to Makki that he had taken care of the situation.

Judge Callanan apparently took a guilty plea under advisement on October 28, 1980. The judge subsequently dismissed the citation on April 30, 1981.

### 3. HANNA JUDEH

In June 1981 the government informant Judeh was actually charged by the state of Michigan with criminal sexual conduct in the third degree. His offense involved the alleged molestation of a retarded fourteen year old girl. Judeh first unsuccessfully attempted to pass a $2,000 bribe through a court employee. Qaoud told Judeh that it would cost $3,000 to $5,000 to fix the sexual conduct charge. Qaoud explained that the judge would either promptly dismiss the charge for lack of probable cause or bind it over for another date when he was serving as a visiting circuit judge with jurisdiction over such a felony charge.

At the government's prompting, Judeh also placed a call to Richard Debs, a local union official and probation officer. Debs was another associate of Judge Callanan, a defendant acquitted in this case. Debs subsequently appeared with Evan Callanan, Jr. at the gas station where Judeh was employed. They agreed to help Judeh if he would fire his present lawyer and hire Callanan, Jr.'s firm. After Judeh retained Callanan's firm, Callanan, Jr. assured Judeh of receiving probation once his father heard Judeh's case as a circuit judge. Judeh paid him $2,500, in cash, accordingly.

Judeh was sentenced by Judge Callanan on November 22, 1981 to three years probation. The judge based the probation on a psychiatric analysis of Judeh arranged by Callanan, Jr. Another member of Callanan's firm (Barbara Miller) represented Judeh in court. Judeh eventually paid $3,500 more to Debs.

### 4. MITCHELL GOLOFIT

After sentencing Judeh, Judge Callanan began stopping by his gas station. Callanan, Sr. apparently obtained free services from Judeh. Judeh approached the judge directly about the actual case involving Mitchell Golofit, the brother of a gas station employee, and Callanan, Sr. indicated that he would review the file.

On December 15, 1981, Judge Callanan returned to the gas station with the file, stating he would try to work something out for Golofit if Judeh brought him to court.

This conversation was recorded and the government photographed Judge Callanan with file in hand.

Judeh subsequently appeared in court with Golofit. Before the proceeding, Callanan told Judeh that Golofit should plead guilty and he would take the case under advisement. Golofit followed this instruction, but the ultimate disposition of the case by Judge Callanan is unclear, apparently because local police officials became suspicious of Judge Callanan's handling of the case. Judge Callanan told Judeh not to say anything about the case to inquiring police officials and stated that he could not trust Golofit.

### 5. JAMES SIRES

In the spring of 1982 the government arranged one more "sting" operation involving Judeh and another alleged friend who assumed the identity of James Sires, a purported friend of the undercover agent known as "Izzy." Callanan, Sr. and Qaoud had many meetings with Judeh at the service station concerning this matter. Concern was expressed that Sires was charged with two felonies. The judge eventually agreed to get the charges reduced to misdemeanors and assume jurisdiction in exchange for $3,000. He testified at trial that although he counted the money, he then returned it to Judeh.

This operation involving Sires eventually ran into serious problems. A court clerk sent official correspondence to the Sires' residence (his parents' home). The local police department learned about the apparent mistake, and this information eventually came to Judge Callanan's attention. The FBI subsequently approached Callanan, Sr. about the case. He denied any knowledge or participation in a kickback scheme for judicial favors.

### 6. THE COVER–UP

Soon thereafter Judge Callanan and Debs contacted Judeh and discussed matters while riding together in a car. The judge demanded Judeh's silence if he were approached by the FBI. Debs kept in frequent contact with Judeh.

On July 6, 1982 Callanan, Jr. appeared before the federal grand jury. He denied telling Judeh that the other member of his firm would only be the attorney of record in his sex conduct case. Callanan, Jr. also denied telling Judeh that he had talked to his father about the case. This conversation in which Callanan, Jr. made these statements was tape recorded.

Callanan, Jr. and other associates subsequently had a meeting with Judeh at the service station. Callanan, Jr. threatened more legal problems for Judeh on his probation unless he kept quiet.

1. **DEFENSE MOTIONS TO DISMISS THE INDICTMENTS DUE TO A) INTERFERENCE WITH STATE JUDICIAL PROCESS AND B) GENERALLY OUTRAGEOUS FEDERAL MISCONDUCT DURING THE INVESTIGATION**

The government first allowed the manipulation of normal state processes in Judeh's particular case for evidentiary purposes. State judicial officials, however, were apprised of the investigation. For example, on May 7, 1982—months after Judeh's sex conduct case—U.S. Attorney Gilman wrote to the office of state intermediary, Joseph F. Regnier, Executive Director of the State Judicial Commission, confirming that they had discussed the "entire investigation" and all relevant evidence uncovered.

There is no explicit indication that the government contacted the state officials before using the Judeh charge in its sting operation. Neither Mr. Regnier nor State Supreme Court Chief Justice Coleman, however, apparently registered a complaint. Chief Justice Coleman registers surprise in a May 27, 1982 letter about the use of an undercover agent as a criminal in state court. Yet the whole correspondence as well as Mr. Regnier's subsequent letter to her on the matter suggests that such use should have been expected.

■ Actual knowledge on the part of state officials regarding the federal investigation of Judge Callanan and his associates reduces the substantive weight of the defendants' argument expressing "federalism" concerns. The absence of the state's intervention in this suit or their pursuit of separate injunctive relief against federal manipulation indicates an absence of state concern about interference with state judicial processes. Defendants are not permitted to speak for the state and to claim the benefits of the state's possible complaint which was never expressly set out to federal investigators.

■ The defendants argue that an independent ground for dismissing the case is our inherent supervisory power, which may be exercised to prevent outrageous investigative conduct. We are not persuaded by either of defendants' arguments as to federalism concerns, or of outrageous conduct by federal officials. We address defendants' contentions of due process deprivations under the circumstances. *See United States v. Robinson*, 763 F.2d 778 (6th Cir. 1985). In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court indicated that it had not yet encountered a level of "outrageous" government investigative conduct that constituted a *per se* deprivation of due process. 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *see also Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). Similarly, in *United States v. Brown*, 635 F.2d 1207, 1212 (6th Cir.1980), this court refused to find a due process violation even though the government acquiesced in an informant's participation in over forty burglaries. This court has emphasized four key factors in such a determination: the need for that type of police conduct, the impetus for the scheme, the control exerted by the government over the criminal enterprise, and the impact of police activity on the crime. *See, e.g., United States v. Norton*, 700 F.2d 1072, 1075 (6th Cir.), *cert. denied*, 461 U.S. 910, 103 S.Ct. 1885, 76 L.Ed.2d 814 (1983); *Brown, supra;* see also *Robinson, supra.*

The key factual points emphasized by the government are 1) that it did not know of or encourage Judeh's commission of a sex

crime and 2) did not provide him with kick-back money on this occasion. The defendants do not dispute these points. Judeh's guilt, moreover, has never been established, but the government acquiesced in preventing such a genuine determination in state court.

Although we do not necessarily countenance the government's participation in this circumvention of genuine state process, we conclude that the government's actions under the circumstances are neither so shocking nor such an unwarranted interference that we should set aside the verdicts. *The state* itself or the alleged sex conduct victim may have grounds for complaint, but we· do not translate this into a constitutional due process violation which may be claimed by wrongdoers willing to subvert the state judicial process. While we note the argument that the defendants procedurally waived this issue at trial, we have chosen to deal with it on the merits.

### 2. EVIDENTIARY RULINGS CONCERNING JUDGE CALLANAN'S DUE PROCESS CLAIMS

■ Judge Callanan argues that his due process rights were violated by the court's refusal to allow introduction of evidence about another influence peddler (Louis Perry) who failed to receive help from Judge Callanan on another matter. Although apparently indicted and separately tried, Perry was not alleged to be a member of the RICO conspiracy here.

Judge Callanan argued that this evidence reflected a "general pattern" of behavior followed by him, citing *United States v. Riley*, 550 F.2d 233, 236 (5th Cir.1977), (error to exclude "general pattern" evidence that was "crucial to the defense"). *Riley* sought to introduce evidence of some eighty checks showing a claimed pattern inconsistent with the requisite criminal intent on misapplication of funds charged. In this case, however, the evidence proffered was not crucial to the charges and involved a totally different incident, which demonstrates little or nothing about Callanan's intent on the charges made in this

indictment. *See United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir.1978) ("Evidence of non-criminal conduct to negate inference of criminal condition is generally irrelevant").

■ Judge Callanan also complains about the government's cross-examination inquiring about the mechanics of "judge-shopping" after Judge Callanan insisted on direct examination that he could not schedule his own cases. Such searching cross-examination into defendant's contention does not constitute error. Judge Callanan's assertions on direct examination clearly served as foundation for such cross-examination.

No reversible error occurred; there were no due process rights shown to be violated.

### 3. MISTRIAL MOTION

■ After one week of the seven week trial, during the protracted cross-examination of government witness Hanna Judeh about the "Sires" sting,[1] the defendants offered as evidence a segment of a government surveillance tape. The government objected to its relevance. In a side bar discussion, the defense claimed that the tape contained rustling noises caused when Judeh repocketed money which he had testified he used to bribe Judge Callanan at Judeh's filling station. The trial judge permitted the defense to play this portion of the tape. The trial judge interrupted the tape, however, to comment that he heard nothing but country music or traffic noises in the background. The judge was thus unwilling to continue hearing the tape offered as evidence by defendants. At the close of the day, the defense moved for a mistrial based on the judge's comment. The trial judge responded:

> I certainly did interrupt the tape because you represented that it had sounds on it that would mean something. It was nothing but traffic sounds for the entire time. I certainly did interrupt it because the tape—there is a rule of relevance even on cross examination.

---

1. Judeh's examination at trial lasted 10 days.

On the next trial day, with defendants' consent, the court gave the following curative instruction:

Members of the jury, on Friday at the close we were listening to that one tape, and I said well, I don't hear anything on the tape, some remarks to that effect. You should completely and totally ignore anything I said about that tape. You are the sole judges of the facts and you alone are the ones to judge what is on the tape. You should completely forget anything I said and ignore anything I said because, as I say, you are the sole judges of the facts.

During the final instructions at the close of the trial the judge told the jury the following:

I have not meant to indicate any opinion as to any of the facts in the facts in this case by any of my rulings, conduct or remarks during this trial, but if you think I have, you should disregard it because you are the sole judge of the facts and what the verdict shall be is your sole and exclusive responsibility.

The defendants make no showing that this particular tape of one transaction was *crucial* to the defense against the RICO charges. The defendants argue that it would challenge a predicate element of bribery under RICO. Yet so-called "rustling noises" certainly establish nothing conclusive or significant in our view. We find no reversible error in these circumstances. This situation does not equate to those cited by appellants where remedial instructions were held insufficient. *Moody v. United States*, 377 F.2d 175 (5th Cir. 1967) (trial judge "congratulated" witness on incriminating defendants in front of jury); *Bursten v. United States*, 395 F.2d 976 (5th Cir.1968) (judge interrogated witnesses in highly partisan fashion). Error here, if any, was remedied by the judge's curative instructions.

### 4. CROSS–EXAMINATION REGARDING CRIMINAL CONDUCT OF JUDGE CALLANAN FOR WHICH HE WAS NOT INDICTED

 The question raised by Callanan, Sr. is whether the prejudicial nature of the cross-examination in question outweighed its probative value upon his credibility under F.R.E. 608(b). On direct examination the government attempted to introduce evidence about Judge Callanan's illicit use of judicial defendant-bond funds at a party store for his own purposes, involving Judeh and others unrelated to the indictment charges. The trial judge refused to allow the government to introduce evidence of unindicted activities on direct examination, but Judge Callanan then took the stand and denied all improper conduct. The government then was allowed to introduce the bond checks for purposes of impeachment under 608(b).

Defendant relies on *United States v. Pintar*, 630 F.2d 1270, 1284–85 (8th Cir. 1980), in support of his contention that introduction of alleged kickback checks involving other offenses on cross examination was unduly prejudicial, but *Pintar* involved no kickback or bribery charges. We find the *Pintar* case therefore readily distinguishable. It is well settled that past conduct of a witness can be probative of truthfulness or untruthfulness. *United States v. McClintic*, 570 F.2d 685, 690 (8th Cir.1978); *see also United States v. Brown*, 547 F.2d 438, 444 (8th Cir.), *cert. denied*, 430 U.S. 937, 97 S.Ct. 1566, 51 L.Ed.2d 784 (1977). Moreover, in the instant case, Judge Callanan actually admitted that he had negotiated bond checks to Judeh on cross examination, but he denied the other transactions at a party store. The government reinforced in the jury's eye the bond check connection between Judeh and Judge Callanan by the evidence in question. There was no demonstrated abuse of discretion in the court's evidentiary rulings in respect to these matters.

### 5. EFFECT ON CALLANAN, JR.'S CONVICTION ON TWO COUNTS OF MAIL FRAUD (COUNTS 4 AND 5); JUDGE CALLANAN'S ACQUITTAL ON THESE TWO COUNTS

Count 4 concerns the mailing to Judeh's previous counsel in the sex conduct case his

decision to switch attorneys and to retain Callanan's law firm. The letter stated that an attorney in the Callanan firm, Barbara Miller, would now serve as Judeh's counsel. After Judeh expressed reluctance to take the notice to his old counsel, Callanan, Jr. agreed to cause it to be sent. Count 5 stemmed from Judeh's former counsel's transmission of the notice with his signature affixed.

The mail fraud charged under 18 U.S.C. § 1341 (1976) in both counts was a scheme involving the mails to defraud the public of the honest extended and objective services of Judge Callanan. Callanan, Jr. argues that his convictions cannot stand since Judge Callanan was acquitted of these charges.

Callanan, Jr. relies on *United States v. Freedman*, 568 F.Supp. 450 (N.D.Ill.1983), in support of this argument, also involving a mail fraud scheme involving the bribery of judges. The government in *Freedman*, however, failed to allege any connection between the defendants and a judge. Their scheme was apparently to collect monies but not actually to pay it over to public officials for bribery purposes. The *Freedman* court held that the mail fraud theory alleged could not stand under the pleading. Yet, the *Freedman* court also stated that "there is no doubt a private attorney who uses the mails to defraud including the actual bribery of public officials is indictable under Section 1341." 568 F.Supp. at 453. In this case, unlike *Freedman*, a particular judge was named and indicted.

■ Callanan, Jr.'s contention boils down to argument that inconsistent verdicts were rendered as to his father and him. Yet the verdicts are not necessarily inconsistent. The jury could have simply come to the conclusion that the judge neither "caused" nor knew of these particular mailings within the meaning of Section 1341. This would not prevent a consistent finding on other counts that the Callanans, father and son, were involved in a larger scheme as charged. We find no merit in this assertion of error.

## 6. DID THE TRIAL COURT GIVE ADEQUATE INSTRUCTIONS ON MAIL FRAUD CRIME INVOLVING A PUBLIC OFFICIAL?

Upon examination of defendants' argument in this respect, we conclude that the district court sufficiently instructed the jury on the relevant elements of the offense of mail fraud. Defendants, moreover, may have waived this objection under Federal Rule of Criminal Procedure 30 by failing to make any objections about the instructions to the trial judge. Indeed, the prosecution points to evidence that the defense counsel agreed to the judge's proposed brief instructions on elements of mail fraud. On either basis, we overrule defendants' contentions on the content and adequacy of the instructions to the jury.

## 7. MAILING UNDER 18 U.S.C. § 1341

■ Both Callanans challenge their convictions on Count VI which involved the notice from Callanan's law firm to Judeh about his sentencing. They argue that this was an innocent mailing not devised for the purpose of carrying out an unlawful scheme. They do not dispute, however, that the notice sent by Callanan, Jr. disguised the fact of his representation of Judeh by naming another attorney in the firm as lawyer of record. If deemed by the jury an attempt to avoid detection, this would be a sufficient basis for conviction under the statute. *See United States v. Hopkins*, 357 F.2d 14, 17 (6th Cir.), *cert. denied*, 385 U.S. 858, 87 S.Ct. 107, 17 L.Ed.2d 84 (1966) (the mailings do not have to contain fraudulent matters). *Cf. United States v. Tarnopol*, 561 F.2d 466 (3d Cir. 1977), and *Parr v. United States*, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960). We find that the change was adequate under the law, and that there was sufficient evidence upon which to base a conviction for mail fraud.

**8. THE ELEMENTS OF CALLANAN, JR.'S ALLEGED VIOLATION OF OBSTRUCTING A CRIMINAL INVESTIGATION, 18 U.S.C. § 1510, (COUNT VII)**

██ Callanan, Jr. argues, without citing any supporting case law, that in order to sustain a conviction on this charge, the government must prove that he was aware of a violation of federal criminal law before he can be convicted of obstruction. Callanan, Jr.'s cover-up activities regarding Judeh's silence sufficiently constituted a basis for an obstruction of justice charge and there was sufficient evidence of the intent required. The jury instruction in respect to this charge was a standard one. No error was demonstrated by defendants in respect to Count VII.

**9. INDICTMENT OF CALLANAN, JR. FOR FALSE DECLARATIONS BEFORE A GRAND JURY, 18 U.S.C. § 1623**

██ The government's indictment precisely identified Callanan, Jr.'s alleged falsehoods before the grand jury. The indictment listed simple questions to which Callanan answered "yes" or "no." Callanan cites passages from two opinions stating the "indictment must set out ... objective truth," *United States v. Tonelli,* 577 F.2d 194, 195 (3d Cir.1978), and "the grand jury must charge specifically what it believes are the true factors," *United States v. Slawik,* 548 F.2d 75 (3d Cir.1977). These cases involved insufficient indictments that failed to identify the specific falsity in statements made by the defendants. This circuit's recent opinion in *United States v. Eddy,* 737 F.2d 564 (6th Cir.1984), however, upheld essentially the same form of indictment in an action for false statements influencing a federal bank under 18 U.S.C. § 1014 (1976 & Supp. IV 1980). By analogy to *Eddy,* the indictment here is upheld

as being in substantial compliance with the statute.

**10. CONTINUING CRIMINAL ENTERPRISE AND CONSPIRACY**

Count two of the indictment charged all defendants with violating the substantive offense set forth in 18 U.S.C. § 1962(c) (1976) (the RICO statute).[2] Count one charges the defendants with violating 18 U.S.C. § 1962(d) (1976) by conspiracy to violate § 1962(c).

The government must prove these elements to establish a violation of § 1962(c):

1) the defendant engaged in an enterprise;

2) the enterprise affected interstate commerce;

3) the enterprise's affairs were conducted through a pattern of racketeering activity; and

4) the conduct of those affairs involved two or more of the racketeering offenses set forth in the statute.

*United States v. Sutton,* 642 F.2d 1001, 1008 (6th Cir.1979) (en banc), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3144, 69 L.Ed.2d 995 (1981).

The defendants present a number of arguments that the government failed to establish these four elements under § 1962(c) as a matter of law. Thus, in their view, neither the substantive RICO charge in count two nor the RICO conspiracy charge in count one can stand because the indictment failed to allege a RICO enterprise which was distinct from the pattern of racketeering activity in which they engaged, and because the indictment failed to properly allege a RICO conspiracy. Defendants also argue insufficient evidence either to establish a distinct RICO enterprise or to show that the enterprise affected interstate commerce.

---

**2.** Section 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partic-

ipate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The RICO statute, it must be remembered, had the broad purpose of providing new means of combatting organized and/or continuing patterns of criminal activity. Congress itself specified:

[t]he provisions of this title shall be liberally construed to effectuate its remedial purposes.

Pub.Law No. 91–452, Title IX § 904(a), 84 Stat. 947 (1970). *See Russello v. United States*, 464 U.S. 16, 21, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *United States v. Licavoli*, 725 F.2d 1040 (6th Cir.), *cert. denied*, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984). RICO applies both to legitimate enterprises conducted through racketeering operations as well as illegitimate enterprises. *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

"[E]nterprise" includes any individual, partnership, corporation, association, or other legal activity, and any union or group of individuals associated in fact although not a legal entity....

18 U.S.C. § 1961(4) (1976).

The government must establish, in a RICO prosecution, a "pattern of racketeering activity," which as defined in 18 U.S.C. § 1961(5) (1976), consists of "at least two acts of racketeering activity ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." Under 18 U.S.C. § 1961(1) (Supp. IV 1980), "racketeering activity" includes a wide array of federal and state crimes; in the case at bar, the racketeering activity charged in the indictment is bribery under Michigan law, mail fraud in violation of 18 U.S.C. § 1341, and obstruction of a criminal investigation in violation of 18 U.S.C. § 1510. To establish that an enterprise's affairs have been conducted "through" a pattern of racketeering activity, there must be a nexus between the enterprise and the racketeering activity. *United States v. Cauble*, 706 F.2d 1322, 1331–33 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984); *United States v. Robinson*, 763 F.2d 778 (6th Cir.1985).

Although "enterprise" and "pattern of racketeering activity" are separate elements, they may be proved by the same evidence. In *United States v. Mazzei*, 700 F.2d 85 (2d Cir.), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), construing *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the court rejected the defendant's contention that a RICO conviction requires proof that the enterprise and pattern of racketeering activity were distinct.

We agree that *Turkette* requires the government to prove both the existence of an "enterprise" and a "pattern of racketeering activity." We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements. There is nothing in the language or legislative history of the Act to support the appellant's view. Moreover, it does not make sense to impose a "distinctness" requirement in RICO cases. The appellant would have us rule that his actions are beyond the purview of RICO because he engaged only in point shaving and did not commit criminal acts other than those specifically contemplated in the conspiracy. Mazzei's interpretation would lead to the anomalous result that a large scale underworld operation which engaged solely in trafficking of heroin would not be subject to RICO's enhanced sanctions, whereas small-time criminals jointly engaged in infrequent sale of contraband drugs and illegal handguns arguably could be prosecuted under RICO. The Court will not place its *imprimatur* on such a counter-productive interpretation.

*Id.* at 89.

Other courts have likewise rejected the position that there must be proof of an enterprise distinct from proof of a pattern of racketeering. *See, e.g., United States v. Cagnina*, 697 F.2d 915, 920–21 (11th Cir. 1983) (citing *United States v. DeRosa*, 670 F.2d 889, 895–96 (9th Cir.1982)), *cert. denied*, 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983); *United States v. Bag-*

*nariol,* 665 F.2d 877, 890–91 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Griffin,* 660 F.2d 996, 1001 (4th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 313 (1982); *United States v. Diecidue,* 603 F.2d 535, 545 (5th Cir.1979), *cert. denied* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980).

▇ The office of the Michigan District Court of the 18th District served by Judge Callanan is, in effect, the RICO enterprise charged in this case. A state or local government office or organization may properly be charged as a RICO enterprise. *United States v. Davis,* 707 F.2d 880, 883 (6th Cir.1983); *United States v. Thompson,* 685 F.2d 993, 994–95 (6th Cir.1982) (en banc), *cert. denied,* 459 U.S. 1072, 103 S.Ct. 494, 74 L.Ed.2d 635 (1982).

▇ The indictment in the case at bar alleges that the RICO enterprise was "a group of individuals associated in fact, although not a legal entity, which made use of the Office of the District Judge of the 18th District Court." (Count One, ¶ 1, Count Two, ¶ 2). This form of indictment was employed because of language used in *United States v. Thompson.* It is sufficient in this case particularly in view of the further allegation that the affairs of this enterprise were conducted through a pattern of racketeering activity consisting of bribery, mail fraud, and obstruction of a criminal investigation. There is no requirement, as urged by defendants, that all conspirators be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way; all that is necessary is that the acts are connected to the affairs of the enterprise. *United States v. Sinito,* 723 F.2d 1250, 1261 (6th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 86, 83 L.Ed.2d 53 (1984); *United States v. Sutton,* 642 F.2d at 1017.

▇ Because we conclude that evidence was sufficient to indicate that defendants conducted racketeering activity through the 18th District Court of Michigan, and that the defendant Judge and his co-defendants were associated in fact, and that bribes and mail frauds were made possible through official and illegal conduct of Judge Callanan, together with his co-defendant associates, which deprived the public of the expectation of honest services, we reject the defendants' arguments about the sufficiency of proof of the RICO elements above specified. Evidence was presented to show, if believed, that each of the defendants convicted under Counts One and Two were engaged in an enterprise and/or a conspiracy within the meaning of the Act and that it affected interstate commerce through its nexus with the court and the judge who corrupted the court processes. *See United States v. Sutherland,* 656 F.2d 1181, 1198 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982); *United States v. Robinson,* 763 F.2d 778, 785 (6th Cir.1985). There was sufficient proof also that the enterprise, conducted by defendants in Counts One and Two as associates-in-fact, involved a pattern of racketeering activity centered around bribes and efforts to conceal these bribes involving two or more persons as charged in the indictment. *See United States v. Long,* 651 F.2d 239 (4th Cir.), *cert. denied,* 454 U.S. 896, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *United States v. Altomare,* 625 F.2d 5, 8 n. 8 (4th Cir.1980); *United States v. Cauble, supra,* at 1332, 1333; *United States v. Dozier,* 672 F.2d 531 (5th Cir.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982); *United States v. Robinson,* 763 F.2d 778 (6th Cir.1985).

> The law is well settled that for purposes of § 1962(c) the criminal enterprise need only have a *minimal* impact upon interstate commerce.

*Robinson,* 763 F.2d at 781 (emphasis added). The interstate commerce impact in this case involving the misuse of the office of Judge of the 18th District Court, although insubstantial, was sufficient in light of *Robinson.* It is not the conduct of each individual defendant that must affect interstate commerce, rather the criminal enterprise itself. *United States v. Groff,* 643

F.2d 396, 400 (6th Cir.), *cert. denied,* 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 103 (1981).

The defendants argue that the evidence fails to show that these individuals acted in sufficient concert to constitute an enterprise. They attempt to isolate Judge Callanan from Qaoud's acceptance of money by emphasizing the lack of direct proof that Judge Callanan received money. They also portray Callanan, Jr. as not acting as part of the enterprise. The coordinated nature of the defendants' activity, however, was clearly shown in the Judeh matter and the cover-up. The jury could have inferred other connections by the substantial amount of circumstantial evidence concerning the defendants' enterprise.

Accordingly, we sustain the RICO and separate RICO conspiracy convictions regarding all the contentions made by defendants as to adequacy of proof on the requisite RICO elements.

**11. THE TRIAL COURT'S CHARGE ON THE GOVERNMENT'S BRIBERY THEORY ON THE RICO COUNTS**

■ The defendants argue that count one of the indictment identified as RICO predicates "acts including bribery chargeable under Michigan state law as found in M.C.L.A. Sections 750.117 and 750.118." Section 750.117 specifically punishes the giving of a bribe; Section 750.118, on the other hand, punishes *receipt* of the bribe. The defendants object to the district court's instruction on the Michigan Aider and Abettor statute (M.C.L.A. 767.39) in regard to the alleged participation of Qaoud because aiding and abetting was not explicitly mentioned as a predicate RICO violation in the above-cited passage from the indictment. Judge Callanan complains that this wrongful aiding and abetting instruction impermissively allowed the jury to see Qaoud as his "conduit" or "bag man" despite a lack of direct evidence that Qaoud, in turn, passed the money he received to Callanan, Sr.

Read in the light of the relatively liberal construction usually given RICO pleadings, the indictment gave adequate notice that Qaoud was to be tried as an aider and abettor in respect to the bribery activity. The indictment did not suggest proof of violations by defendants concerning Section 750.117, which concerns giving of a bribe. It merely refers to "acts involving" the giving (§ 750.117) and receipt (§ 750.118) of a bribe. Moreover, the substantive RICO count (count two) of the indictment clearly states the theory that "Evan H. Callanan, Sr., sitting as Judge of the 18th Judicial District Court and *aided and abetted* by Sam Qaoud, defendants herein, did corruptly request and solicit money for the benefit of themselves." We find no merit in this contention about the instructions of the court relative to bribery as related to the RICO offenses.

**12. THE RICO PREDICATE VIOLATIONS OF STATE BRIBERY LAW AGAINST DEFENDANT QAOUD**

■ Charging a private citizen with aiding and abetting the bribery of a public official under Michigan law is the basis for Qaoud's contention of an insufficient RICO predicate in this case.

The bribery statute (§ 750.118) designates a specified class of executive public officials as capable of being *principal* violators of the statute. The issue arises out of the fact that the Michigan Aider and Abettor statute, M.C.L.A. 767.39, M.S.A. 28.979, abolished the old common law distinction between accessory and principal. Whether Qaoud, not a public official, could be considered a principal violator under Michigan law (§ 750.118) is the contention raised. He relies on old Michigan case holding that "where an offense can be committed only by a specified class, aider and abettors cannot be charged as *principals* if they are outside the statute designation." *People v. Meisner,* 178 Mich. 115, 144 N.W. 490, 491 (1913) (emphasis added). *Meisner* was cited in *In Re Vickers' Petition,* 371 Mich. 114, 123 N.W.2d 253, 254 (1963).

Qaoud argues *Meisner* implies that the reach of the Michigan bribery statute simply does not cover him. In *People v. Jacoboni,* 34 Mich.App. 84, 190 N.W.2d 720, 722 (1971), however, the Michigan Court of Appeals did not challenge a trial court's view in a public official *bribery* case that an

aiding and abetting instruction should be submitted against a private citizen involved in such bribery.

In *United States v. Licavoli*, 725 F.2d 1040 (6th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984), we considered the key RICO language that a predicate Act must be "chargeable under state law." *See* 18 U.S.C. § 1961(1)(A) (Supp. IV 1980). The court found that the defendant was still guilty or chargeable with the offense despite state "procedural" law. 725 F.2d at 1047. It is not clear, however, whether Michigan substantive law of bribery does pertain to Qaoud's being charged in this indictment as an aider and abettor.

Conceding that the question is not free from doubt, we hold that the RICO predicate charges of aiding and abetting bribery can be upheld against Qaoud. *Licavoli* counsels that the construction under RICO of chargeability under state law should not be interpreted in a formalistic fashion. *Jacoboni* suggests that the status of a private aider and abettor in a public official bribery case is unclear.

The abolition of a distinction between an accessory and a principal set out in § 28.-979 [§ 767.39] is a part of Michigan Statutes Annotated, Title 28, Vol. 25 *Code of Criminal Procedure*. The purpose of this section, a part of the procedural law, was not only to abolish the common law distinction, but also to enable an aider or abettor of a substantive criminal offense (such as bribery) to be tried and convicted as if he had directly committed the criminal offense. *People v. Palmer*, 392 Mich. 370, 372, 220 N.W.2d 393, 396 (1974); *People v. Gould*, 384 Mich. 71, 77, 179 N.W.2d 617 (1970).

We hold that there is a substantive predicate for the state bribery charges asserted and supported by adequate proof against Qaoud in this case.

**13. JOINDER OF THE CALLANAN, JR. FALSE DECLARATION INDICTMENT WITH THE RICO INDICTMENT**

■ The district court clearly possessed discretion for allowing joinder of the direct-

ly related false declaration charge with the RICO conspiracy charges under Federal Rules of Criminal Procedure 8(b) and 13. Callanan, Jr.'s alleged false declaration pertained to the RICO conspiracy and its concealment, and much of the evidence was applicable to both charges.

We find no merit to this issue raised here by Callanan, Jr. *See United States v. Bibby*, 752 F.2d 1116 (6th Cir.1985); *United States v. O'Connell*, 703 F.2d 645 (1st Cir. 1983).

**14. DID THE RICO CONSPIRACY COUNT (COUNT 1) CHARGE A SEPARATE CRIMINAL ACT FROM THE COUNT 2 RICO COUNT?**

The Supreme Court has recognized that as a general principle conspiracy and the substantive offense that is the object of conspiracy are separately punishable crimes. *See Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284–1289, 43 L.Ed.2d 616 (1975). This court has also specifically held that *Ianelli* allows separate charges for RICO conspiracy and substantive offenses. *See United States v. Sutton*, 642 F.2d 1001, 1040 (6th Cir.1979) (en banc), ("It is apparent to us that §§ 1962 and 1962(d) [the RICO conspiracy and substantive offense provisions] under the holdings of *Iannelli*, [*supra*] ... validate the indictment of these appellants under both sections"), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 995 (1981).

In *Sutton*, however we considered the RICO charges for purposes of sentencing and vacated certain non-consecutive sentences due to the close identity of proofs. The government does not deny an identity of proofs between the RICO conspiracy and substantive offense charges. Yet the government argues that no formal vacation of sentence needs to take place here due to the presence of *consecutive* sentences. *Id.* In light of the Supreme Court's recent opinion in *Ball v. United States*, — U.S. —, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985), however, we believe that the district court

should consider the question of vacating these concurrent RICO sentences. Without expressing any opinion on the merits of this issue, we remand the case only for the limited purpose of considering possible vacation of concurrent RICO sentences under *Ball.*

Accordingly, we AFFIRM the judgment of the district court in all respects except for the limited REMAND to reconsider defendants' claim that a part of the sentences should be vacated in light of *Ball v. United States,* —— U.S. ——, 105 S.Ct. 1668 (1985).