**UNITED STATES of America,
Plaintiff–Appellee,
v.
James NORTON, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,
v.
Paul FOSCO, James Pinckard, Paul A.
Di Franco, James Norton,
Defendants–Appellants.

Nos. 87–5425, 87–5648.**

United States Court of Appeals,
Eleventh Circuit.

March 16, 1989.

Thomas D. Decker, Decker & Associates, Ltd., Thomas A. Foran, Foran, Wiss & Schultz, Chicago, Ill., for defendants-appellants.

Dexter W. Lehtinen, U.S. Atty., John M. Owens, Sp. Atty., U.S. Dept. of Justice, Miami Strike Force, Bill Healy, Miami, Fla., Frank J. Marine, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Samuel J. Betar, Altheimer & Gray, Phillip J. Zisook, Chicago, Ill., for Paul Fosco.

Arnold Kanter, Altheimer & Gray, Dennis P. Birke, Chicago, Ill., for James Pinkard.

Thomas A. Foran, Foran, Wiss & Schultz, Jack J. Carriglio, Chicago, Ill., for Paul DiFranco.

Thomas D. Decker, Decker & Associates, Chicago, Ill., for James Norton.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.

HENDERSON, Senior Circuit Judge:

Paul Fosco, Paul Di Franco, James Norton and James Pinckard were convicted in the United States District Court for the Southern District of Florida of conspiring to participate in racketeering activity involving the unlawful payment and receipt of money from employee welfare benefit plans in violation of 18 U.S.C. §§ 1954 and 1962(d). The charged enterprise consisted of a building and construction workers' union ("the Laborers' Union"), its affiliated local unions in Miami and Chicago, and various employee benefit plans including the "Chicago Trust Fund" and the "Southeast Florida Trust Fund."

The kickback scheme originated in 1970 when the Chicago Trust Fund announced its intention to institute a dental care plan for union members. A corporation, Consultants & Administrators, Inc. ("C & A"), was formed to provide these services. Codefendants Angelo Fosco, who was the father of Paul Fosco, and James Caporale exerted their influence as union representatives to insure that C & A obtained the contract in exchange for payments made to them through the corporation. James Norton was president of C & A, while Paul Di Franco, a dentist, and Paul Fosco, who purportedly handled sales and public relations, were named the corporation's vice presidents. The kickbacks were generated by inflating the appellants' salaries. The excess cash would then be returned to Daniel Milano, Sr., another C & A owner, who in turn paid the money to Angelo Fosco and Caporale.

In 1972 the operation expanded into Florida when C & A submitted its bid for a similar dental services contract for the benefit of Florida Laborers' Union members through a corporation called Dental Vision Care Centers ("DVCC"). Again, it was awarded the contract in exchange for agreeing to pay the Florida union and Trust Fund representatives a percentage of the premiums paid by the benefit fund under the contract. Pursuant to its agreement, DVCC made regular payoffs from 1973 to 1977 to a number of conspirator-controlled companies.

James Pinckard entered the picture in 1974 when the Chicago dental services contract was amended to include vision services and dental services for union members' dependents. Codefendant Alfred Pilotto, a Chicago Trust Fund representative, ensured that C & A would receive this lucrative "family contract" in return for a kickback consisting of 10% of C & A's increased premiums. Payments were to be funneled through a corporate arrangement similar to that employed in the Florida operation. Pilotto's son-in-law, Pinckard, acted as a conduit for the illegal payments through a corporation, Pinckard & Associates ("P & A"), ostensibly created to verify patients' eligibility for coverage under the contract.

Following a federal investigation of suspected labor racketeering activities involving these corporations, federal agents obtained search warrants authorizing the search of both C & A's and P & A's administrative offices. Shortly after their indictment, the appellants filed a motion to suppress all materials seized during the search. The district court ordered the corporate records suppressed because it found that the warrants were "unconstitutionally general." The government then filed an interlocutory appeal. This court vacated and remanded to the district court to determine whether the facts supported the application of the "good faith" exception to the exclusionary rule. *See United States v. Accardo*, 749 F.2d 1477 (11th Cir.), *cert. denied sub nom. Pinckard v. United States*, 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985). After an evidentiary hearing, the district court denied the appellants' motion to suppress on the grounds that the law enforcement agents reasonably relied in good faith on the warrants. The appellants eventually were convicted by a jury on April 27, 1987.[1]

---

**1.** Sixteen persons were indicted by the grand jury. The cases of the appellants were severed

■ Norton urges reversal of his conviction and dismissal of the indictment on the grounds that the government failed to present sufficient evidence before the grand jury to support the indictment. This argument is foreclosed, however, by the decision in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), in which the United States Supreme Court held that inadequate or incompetent evidence before a grand jury could not be a basis for challenging an indictment where the indictment resulted in an otherwise valid conviction. 350 U.S. at 363–64, 76 S.Ct. at 409, 100 L.Ed. at 402–03. This court consistently has followed the *Costello* rule to preclude appellate review of sufficiency of the evidence before the grand jury. *See, e.g., United States v. DiBernardo*, 775 F.2d 1470, 1478 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 357 (1986); *United States v. Cruz*, 478 F.2d 408, 412 (5th Cir.), *cert. denied sub nom. Aleman v. United States*, 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973); *Cohen v. United States*, 436 F.2d 586, 587 (5th Cir.), *cert. denied*, 403 U.S. 908, 91 S.Ct. 2215, 29 L.Ed.2d 684 (1971). We therefore decline to review it here.

■ The appellants also challenge the sufficiency of the evidence on two other grounds. First, Pinckard contends that the government's case against him failed because he was not a member of any of the four classes of persons subject to the statute.[2] Contrary to this assertion, Pinckard's involvement fell within the fourth classification contained in the statute, which includes any "person who, or an officer, counsel, agent or employee of an

organization which provides benefit plan services" to an employee pension benefit plan. 18 U.S.C. § 1954(4). The statute does not require direct employment by the benefit plan. *See United States v. Russo*, 442 F.2d 498, 502 (2d Cir.1971), *cert. denied*, 404 U.S. 1023, 92 S.Ct. 669, 30 L.Ed. 2d 673 (1972). Pinckard provided such services to the plan through C & A, which contracted directly with the Chicago Trust Fund. Since P & A was created primarily to serve as a channel for kickbacks to Alfred Pilotto, who had obtained the contract for C & A, we find his connection to C & A sufficient to sustain his guilt for an offense under Section 1954. That Pinckard "knowingly joined the group which *agreed to make*" payments to Pilotto, a benefit fund trustee, is more than sufficient to uphold his conviction. *See United States v. Provenzano*, 615 F.2d 37, 44 (2d Cir.) (emphasis in original), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980).

Moreover, 18 U.S.C. § 1954 also includes "*any* person who directly or indirectly gives or offers, or promises to give or offer, any fee, kickback, commission, gift, loan, money or thing of value prohibited by this section." (emphasis supplied). Given the ample evidence that Pinckard was not only aware of the others' participation in the scheme, but also that he agreed to forward the payments to Pilotto, his conviction under Section 1954 is supported on either of these grounds.

■ Pinckard was not charged with a Section 1954 violation but with conspiracy to conduct the affairs of an enterprise through a pattern of "racketeering activity" in violation of 18 U.S.C. § 1962(d).

for trial from that of their codefendants. Of the remaining defendants, all were convicted except Angelo Fosco, Terrence O'Sullivan and Anthony Accardo, who were acquitted, and Santo Trafficante, who was later dismissed as a defendant.

2. The four categories enumerated in 18 U.S.C. § 1954 are:

(1) An administrator, officer, trustee, custodian, counsel, agent, or employee of any welfare benefit plan or employee pension benefit plan; or

(2) an officer, counsel, agent, or employee or an employer or an employer any of whose employees are covered by such plan; or

(3) an officer, counsel, agent, or employee of an employee organization any of whose members are covered by such plan; or

(4) a person who, or an officer, counsel, agent, or employee of an organization which provides benefit plan services to such plan [who] receives or agrees to receive or solicits any fee, kickback, commission, gift, loan, money or thing of value because of or with intent to be influenced with respect to, any of his actions, decisions, or other duties relating to any question or matter concerning such plan ...

Even if he could not be found guilty as a principal under Section 1954, "[t]he government need only prove that [the] defendant conspired to commit the substantive RICO offense and was aware that others had done likewise" in order to support a RICO conspiracy charge. *United States v. Pepe,* 747 F.2d 632, 660 (11th Cir.1984). Thus, Pinckard's related argument that the indictment must fail because it did not allege that he was a member of the class of persons amenable to section 1954 is without merit.

■ 18 U.S.C. §§ 1962(c) and (d) make it a crime to conspire to participate in the affairs of "any enterprise engaged in, or the activities of which affect, interstate or foreign commerce ... through a pattern of racketeering activity." The appellants' second attack on the sufficiency of the evidence centers around the government's alleged failure to establish the requisite nexus between the enterprise and interstate commerce.

The charged enterprise was the Laborers' Union, its subordinate local unions, and its affiliated employee benefit plans. It is well established that the enterprise, and not the individual charged with violating the statute, must engage in or affect interstate commerce. *See, e.g., United States v. Qaoud,* 777 F.2d 1105, 1116 (6th Cir. 1985), *cert. denied sub nom. Callanan v. United States,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Conn,* 769 F.2d 420, 423–24 (7th Cir. 1985); *United States v. Dickens,* 695 F.2d 765, 781 (3d Cir.1982), *cert. denied,* 460 U.S. 1092, 103 S.Ct. 1792, 76 L.Ed.2d 359 (1983); *United States v. Groff,* 643 F.2d 396, 400 (6th Cir.), *cert. denied sub nom. Turbyfill v. United States,* 454 U.S. 828, 102 S.Ct. 121, 70 L.Ed.2d 103 (1981); *United States v. Rone,* 598 F.2d 564, 573 (9th Cir.1979), *cert. denied sub nom. Little v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). Although a criminal undertaking often is involved, in many cases the government charges an enterprise consisting of a legitimate organization, the activities of which are conducted through a pattern of racketeering. *See, e.g., United States v. Stratton,* 649 F.2d 1066, 1075 n. 12 (5th Cir.1981). The Laborers' Union and its subordinate locals in various states including Florida and Illinois, as well as its affiliated benefit plans, was just such an enterprise, representing thousands of employees in the building and construction industries.[3] Where, as here, the "very nature of the powers and duties" conferred upon the enterprise is interstate in character, the requisite interstate nexus is present. *Cf. United States v. Bagnariol,* 665 F.2d 877, 893 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982); *United States v. Altomare,* 625 F.2d 5, 7–8 (4th Cir.1980). The requirement also is met if the enterprise affects interstate commerce, even though it is the racketeering activities that influence commerce. *United States v. Conn,* 769 F.2d at 424; *accord United States v. Qaoud,* 777 F.2d at 1116; *United States v. Dickens,* 695 F.2d at 781. Here, various officials and representatives of the Laborers' Union locals and their benefit funds traveled between Florida and Illinois to discuss conspiratorial matters, including payoffs from C & A pursuant to the conspiracy. Accordingly, there was more than sufficient evidence of an interstate commerce connection to support the appellants' convictions.

■ As stated earlier, the district court, on a remand from this court, conducted an evidentiary hearing on the good faith exception to the exclusionary rule established in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). This remand and subsequent hearing grew out of the government's interlocutory appeal of the district court's grant of a motion to

---

**3.** In *Donovan v. S & L Development Co.,* 647 F.2d 14, 18 (9th Cir.1981), the court noted that "any construction work, regardless of the size or duration of the project, is likely to have an effect on interstate commerce." Also, Congress has specifically found that employee benefit plans have become "increasingly interstate" in their "operational scope and economic impact." *See* 29 U.S.C. § 1001(a).

suppress evidence seized pursuant to certain search warrants. The warrants in question called for the search and seizure of "all corporate records ... which are evidence and instrumentalities of the offense set forth in Section 1954 of Title 18 United States Code." *See United States v. Accardo,* 749 F.2d 1477 (11th Cir.), *cert. denied sub nom. Pinckard v. United States,* 474 U.S. 949, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985). In *Accardo,* we decided as a matter of law that the good faith exception applied, specifically stating that the warrants' authorization to seize "all corporate records" did not transgress the limitation on the good faith exception involving warrants " 'so facially deficient— *i.e.,* in failing to particularize the place to be searched or the things to be seized— that the executing officers cannot reasonably presume it to be valid.' " *Accardo,* 749 F.2d at 1481 (quoting *Leon,* 104 S.Ct. at 3421). We remanded the case to the district court, however, to afford the parties a hearing on the good faith issue.

On remand the district court found that the law enforcement officers justifiably relied in good faith on the validity of the warrants, and accordingly denied appellants' motion to suppress evidence pursuant to those warrants. Although this court has *de novo* review over the legal issue of whether the officers' reliance on the warrants was objectively reasonable, "the underlying facts upon which that determination is based are binding on appeal unless clearly erroneous." *United States v. Maggitt,* 778 F.2d 1029, 1035 (5th Cir.1985), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986); *accord Accardo,* 749 F.2d at 1481.

More than adequate support exists for the district court's determination that the agents acted in justifiable reliance on the warrants. As we noted in *Accardo,* the agents here "took every step that could reasonably be expected of them," including the submission of an affidavit detailing the pervasive fraud perpetuated by C & A and P & A, which was reviewed and approved by several prosecutors before its presentation to a magistrate. *Cf. Sheppard,* 468 U.S. at 989, 104 S.Ct. at 3428, 82 L.Ed.2d at 744. At the hearing on remand, the FBI Agent who applied for both warrants testified that he believed he needed all of C & A's and P & A's corporate records, especially financial and employment records, to verify the kickback scheme. Because this investigation required the authorities to piece together a "paper puzzle" given the permeative character of the fraud involved, we find that the agent's belief was objectively reasonable. "The reasonableness of the search depends upon the complexity of the crime being investigated and the difficulty involved in determining whether certain documents evidence fraud." *United States v. Sawyer,* 799 F.2d 1494, 1509 (11th Cir.1986). The district court's denial of appellant's motion to suppress was therefore not error.

■ Our review of the record reveals no reversible grounds for the appellants' various challenges to the district court's admission of certain evidence at trial. We reject Fosco's claim that the district court's admission of purported "other crimes" evidence deprived him of a fair trial. Daniel Milano, Jr. ("Milano, Jr."), the prosecution's key witness, testified that both he and Fosco received a monthly raise from C & A in 1975. He further stated that he discussed these increases with his father, Daniel Milano, Sr. ("Milano, Sr."), and Fosco, during which Milano, Sr. instructed his son to return a portion of the raise to him, and similarly directed Fosco to pay his increased supplement to his father, Angelo Fosco. Fosco urges that the testimony concerning Milano, Jr.'s excess payment to Milano, Sr. was unrelated to Fosco's alleged involvement in the conspiracy and unfairly created the inference that he, too, was involved in multiple kickback schemes. Thus, he argues, this evidence allowed the jury to base his conviction on other crimes or extrinsic acts for which he was not charged. This testimony, however, is completely outside the reach of Rule 404(b) of the Federal Rules of Evidence.[4] Rule

4. Fed.R.Evid. 404(b) provides:

*Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible

404(b) deals only with acts committed by the defendant himself, not with crimes committed by other members of the conspiracy. *See United States v. Meester*, 762 F.2d 867, 877 (11th Cir.), *cert. denied sub nom. Sawyer v. United States*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir.1979). The purpose of the rule is to prevent the jury from considering evidence that the *defendant* has, at other times, committed bad acts to convict him of the charged offense.[5] *United States v. Aleman*, 592 F.2d 881, 885 (5th Cir.1979). We further note that an act cannot be characterized as extrinsic and therefore subject to Rule 404(b) when "the evidence concerning that act and the evidence used to prove the crime charged are inextricably intertwined." *Id.* Where, as here, the evidence concerning Milano, Jr.'s illegal payment was "intertwined with the evidence of the ongoing conspiracies ... [it] cannot be labeled 'extrinsic'." *United States v. Meester*, 762 F.2d at 877 (citing *United States v. Aleman, supra*).

■ Pinckard makes two complaints about the admissibility of evidence against him. First, he contends that the government's introduction of checks made payable to him and totalling over $334,000.00 constituted an improper attempt to forge a link between his financial status and his guilt. He insists that the check evidence was irrelevant under Fed.R.Evid. 402,[6] and even if minimally material, was highly prej-

udicial and thus inadmissible under Rule 403.[7]

The district court possesses broad discretion to admit evidence if it has any tendency to prove or disprove a fact in issue. *United States v. Finestone*, 816 F.2d 583, 585 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987); *United States v. King*, 713 F.2d 627, 631 (11th Cir.1983), *cert. denied sub nom. McGlocklin v. United States*, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984). Conversely, we are mindful that the court's discretion to exclude evidence under Rule 403 is narrowly circumscribed. "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir.), *cert. denied,* 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984); *accord United States v. Plotke*, 725 F.2d 1303, 1308 (11th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). The balance under the Rule, therefore, should be struck in favor of admissibility. *Finestone*, 816 F.2d at 585. The district court is vested with considerable discretion to admit such probative evidence. Its decision will not form a basis for reversible error "unless the defendant can demonstrate abuse of that discretion." *United States v. Mitchell*, 666 F.2d 1385, 1390 (11th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982).

---

to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

5. Fosco is precluded from arguing that Milano, Jr.'s testimony with respect to Fosco's complicity falls within the parameters of Rule 404(b). The indictment specifically alleged that during the relevant time period "defendant PAUL FOSCO *had conversations with* and received payments from employees of Consultants and Administrators as illegal kickbacks for his father, defendant ANGELO FOSCO." (emphasis added). Milano, Jr.'s testimony concerning Fosco cannot be termed evidence of acts extrinsic to those for which he was indicted. *See United States v. Finestone,* 816 F.2d 583, 586–87 (11th Cir.), *cert.*

denied, — U.S. —, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987).

6. Fed.R.Evid. 402 states:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

7. Fed.R.Evid. 403 provides that

[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Admission of the disputed checks was relevant to establish the conspiracy. It showed that funds were to be returned to Pilotto, Pinckard's father-in-law; that Pilotto received a benefit or "thing of value," and that Pinckard was compensated for his role in the charged offense. Although the government produced no direct evidence that Pinckard transferred any of the check proceeds to Pilotto, the jury, buttressed by Milano, Jr.'s testimony concerning Pinckard's participation in the scheme, certainly was entitled to infer from the evidence that the checks made to Pinckard were intended to generate kickbacks to Pilotto. *Cf. United States v. Parness*, 503 F.2d 430, 438 (2d Cir.1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). Neither does this evidence merit exclusion under Rule 403. While it is true that "[a]ll evidence which tends to establish the guilt of a defendant is, in one sense, prejudicial to that defendant, ... that does not mean that such evidence should be excluded. It is only when the probative value of evidence is 'substantially outweighed by the danger of *unfair* prejudice' ... that relevant evidence should be excluded." *United States v. Bailleaux*, 685 F.2d 1105, 1111 (9th Cir. 1982) (emphasis in original), *accord United States v. Betancourt*, 734 F.2d at 757; *United States v. King*, 713 F.2d at 631. We are not persuaded by Pinckard's attempt to compare his case with *United States v. Nill*, 518 F.2d 793 (5th Cir.1975). In *Nill*, the prosecutor had cross-examined the defendant as to his ambitions to become a millionaire. The former Fifth Circuit Court of Appeals reversed the defendant's conviction on the grounds that the cross examination "was allowed to generate into a personal attack calculated to appeal to bias on the part of the jury." 518 F.2d at 802. No such circumstances are present here. Moreover, the court in *Nill* noted that evidence of the appellant's salary would be relevant to show he had fraudulently concealed certain financial transactions. Similarly, the checks in this case were properly admitted to establish the offense.

■ Pinckard next maintains that the district court erred in admitting a summary chart and related testimony on the grounds that they did not conform with the evidence presented at the trial. There was no error.

We recognize the caution with which these summaries are to be utilized, given the possibilities for abuse. *See Gordon v. United States*, 438 F.2d 858, 876 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971); *Myers v. United States*, 356 F.2d 469, 470 (5th Cir.), *cert. denied*, 384 U.S. 952, 86 S.Ct. 1572, 16 L.Ed.2d 548 (1966). The decision to allow the use of such illustrative charts, however, is a matter well within the trial court's discretion and is subject to reversal only if there has been an abuse of that discretion. *United States v. Diez*, 515 F.2d 892, 906 (5th Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 780, 46 L.Ed.2d 641 (1976); *Baines v. United States*, 426 F.2d 833, 840 (5th Cir.1970). Any issue as to the propriety of introducing summaries during a trial was foreclosed by the enactment of Fed.R.Evid. 1006 in 1975.[8] *United States v. Smyth*, 556 F.2d 1179, 1183 (5th Cir.), *cert. denied*, 434 U.S. 862, 98 S.Ct. 190, 54 L.Ed.2d 135 (1977).

The government's chart and accompanying testimony illustrated that payments to the conduit companies represented approximately 15% of the premiums paid by the Southeast Florida Trust Fund to DVCC and two of DVCC's affiliated doctors, Graham and Catarello. Pinckard objects to the chart, arguing that it erroneously assumed that payments to Graham and Catarello were part of the 15% calculation. Without their inclusion, he asserts, the percentages would not corroborate the testimony provided by Daniel Milano, Jr., upon which the government extensively relied. The chart's assumptions, however, are amply supported by the evidence presented to the

---

8. Rule 1006 provides:
   The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

jury. The witness who prepared the summary chart explained that payments made to these two doctors were, in effect, payments to DVCC since they provided health care services as independent contractors for DVCC pursuant to DVCC's contract with the Florida Trust Fund. "[T]he essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record." *United States v. Diez,* 515 F.2d at 905; *accord United States v. Jennings,* 724 F.2d 436, 442 (5th Cir.), *cert. denied,* 467 U.S. 1227, 104 S.Ct. 2682, 81 L.Ed.2d 877 (1984). Furthermore, where, as here, the defense conducted a thorough cross examination of the witness concerning the disputed matters, and also had the opportunity to present its own version of those matters, the likelihood of any error in admitting summary evidence diminishes. *See id.* at 442; *United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983). Coupled with the trial court's accompanying instruction to the jury that the summary chart was not evidence and therefore should be accorded its due weight, we find that the court did not abuse its discretion in admitting it. *See United States v. Smyth,* 556 F.2d at 1185; *accord United States v. Diez,* 515 F.2d at 905.

The district court also did not err in admitting a memorandum which detailed a telephone conversation between Robert Paul and Wendyl Link, two former officers of the Segal Company, a consulting firm that had rendered services to the Laborers' Union. The document, which was prepared by Paul and admitted into evidence through Link's testimony, reflected Link's concerns over Norton's suspected involvement in the dental plan. Norton contends that the memorandum was inadmissible under the business records exception to the rule against hearsay because Link had no personal knowledge of its contents, that there

was insufficient evidence to establish that the memorandum was created as part of a regular business practice or that it was made at or near the time of the conversation, and that it was patently untrustworthy.[9] Our examination of the record refutes this. There was more than ample evidence to warrant admission of the memorandum under Rule 803(6).

Neither are we persuaded by Norton's argument that admission of the memorandum violated his right to confront witnesses against him. The challenged memorandum was, as we have stated, sufficiently trustworthy and reliable. Also, defense counsel had the opportunity to cross examine the custodian, Link, respecting its accuracy. *See United States v. Peden,* 556 F.2d 278, 281 (5th Cir.), *cert. denied,* 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed. 2d 150 (1977). The Supreme Court recently observed in a related context that the prosecution is not required to demonstrate either unavailability of the declarant or an independent indicia of reliability when the evidence falls within a hearsay exception as "firmly rooted" as the co-conspirator exception to the hearsay rule. *Bourjaily v. United States,* 483 U.S. 171, ——, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144, 157 (1987). By analogy, we find the business records exception to the hearsay rule to be "firmly enough rooted in our jurisprudence" to satisfy the requirements of the Confrontation Clause where, as here, the document was properly admitted under the exception. *Id.* "Properly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions." *Ohio v. Roberts,* 448 U.S. 56, 66 n. 8, 100 S.Ct. 2531, 2539 n. 8, 65 L.Ed.2d 597, 608 n. 8 (1980).

Nor do we find that the admission of certain documentary evidence, consisting of various contracts, letters, invoices, checks, deposit slips, vouchers, and bank state-

---

9. Fed.R.Evid. 803(6) provides in pertinent part:
   A memorandum ... of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, [is not excluded by the hearsay rule, even though the declarant is available as a witness] if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum ... as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness.

ments, constituted an abuse of discretion. There is more than enough evidence in the record to establish a proper foundation for the challenged records and to support their admission under Rule 803(6).

▇▇▇▇ The appellants charge that the prosecutor's comments in summation amounted to a direct reference to their failure to testify, thereby depriving them of a fair trial, is likewise without merit. Although a prosecutor's direct reference to a defendant's failure to testify clearly violates the defendant's fifth amendment right against self incrimination, entitling him to a new trial, *see Griffin v. California*, 380 U.S. 609, 612–14, 85 S.Ct. 1229, 1232–33, 14 L.Ed.2d 106, 108 (1965); *accord Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985), an indirect reference to such a failure is not reversible error per se. Rather, the court must assess the impact of the statement in terms of the context in which it was made. *Id.* A comment is deemed to refer to a defendant's silence if either (1) it was the prosecutor's manifest intention to refer to the defendant's silence or (2) the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on the defendant's silence. *United States v. Rosenthal*, 793 F.2d 1214, 1243 (11th Cir.1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987).

▇▇▇ Here, the prosecutor did not directly refer to the *defendants'* decision not to testify, but to *defense counsel's* failure to rebut the government's evidence.[10] This court repeatedly has held that a defendant's fifth amendment privilege is not infringed by a comment on the failure of the defense, as opposed to the defendant, to counter or explain the testimony presented or evidence introduced. *See United States v. Davidson*, 768 F.2d 1266, 1272 (11th Cir.1985); *United States v. Bright*, 630 F.2d 804, 825 (5th Cir.1980); *United States v. Dearden*, 546 F.2d 622, 625 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *United States v. Hill*, 508 F.2d 345, 347 (5th Cir.), *cert. denied*, 422 U.S. 1009, 95 S.Ct. 2633, 45 L.Ed.2d 672 (1975). In the context of this case, we do not believe the prosecutor's statement to be such that the jury would "naturally and necessarily" construe it as a comment on the defendants' silence. We more reasonably view it as a permissible "comment on logical inferences from all of the evidence rather than an argument requiring a negative inference from the defendant's failure to testify." *United States v. Rutkowski*, 814 F.2d 594, 597 (11th Cir.1987).

▇▇▇ During the jury deliberations, one of the jurors sent a note to the judge requesting that he be excused because the other jurors wanted to convict the defendants while he entertained some doubt as to their guilt. He also inquired whether he was compelled to vote with the majority "even under duress." The defendants made a motion for a mistrial which was denied by the court. The court informed the juror that he could not be excused and further advised him that he was not compelled to vote under duress. The trial judge then gave further instructions to the

---

**10.** The prosecutor stated in his closing argument:

"If you saw all this evidence, you heard everything except Nancy Moreland, Sandra Varco and Danny Milano, you would probably be almost convinced these defendants had been in a scheme to pay bribes. You would be waiting to hear the explanation of how it was not so, and when the people who got up on the stand, who knew about it testified, they said, oh, yes, it was so. Danny Milano, Nancy Milano [sic] and Sandra Varco; what they said makes sense. Is any other explanation reasonable? Not that you heard one, but is any other explanation reasonable? I have been going for a little over two hours and I will stop now and I will wait to hear that reasonable explanation. I will ask you to listen to it very carefully. I will invite

defense counsel to provide you with that explanation."

During the rebuttal portion of his closing argument, the prosecutor then repeated the lack of any reasonable explanation and his exhortation to defense counsel to provide one:

"I told you before I sat down a few minutes ago that if there was another explanation for this circumstantial evidence, that I certainly was going to invite defense counsel to get up and tell you what it was. I have not heard one explanation. Not one. Because there is not any other explanation. If there is no other explanation it means very simply where [sic] Danny Milano and Sandra Varco and Nancy Moreland have told you here under oath is in fact the truth. If it is the truth, then you have to return verdicts of guilty as to these defendants."

jury. The jury resumed its deliberations and returned guilty verdicts against all the defendants some four hours later. This incident provides the inspiration for the final assignment of error by raising the question of whether the circumstances surrounding the jury's deliberations resulted in coerced verdicts. The appellants argue that the juror's note, which revealed the jury's numerical division as to guilt and acquittal as well as that juror's doubts about the defendants' guilt, followed by the judge's refusal to inquire into the nature of the "duress" allegedly experienced by the juror, created confusion among the jury.[11] They also argue that the trial judge's subsequent recharge of the jury improperly urged a verdict and contributed to the coercive atmosphere already created by the juror's note.[12]

The appellants cite *Brasfield v. United States*, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926) and its progeny as support for their argument. *Brasfield*, however, differs from this case in several important respects. The United States Supreme Court held in *Brasfield* that a trial judge's inquiry into the jury's numerical division constituted grounds for reversal. *Brasfield*, 272 U.S. at 450, 47 S.Ct. at 135–36, 71

L.Ed. at 346. In the instant case, the juror offered this information without any solicitation from the judge. Although an inquiry by the court clearly is improper, the former Fifth Circuit Court of Appeals has recognized that the unsolicited disclosure of the jury's division by a juror is not by itself a ground for a mistrial. *United States v. Warren*, 594 F.2d 1046, 1049 (5th Cir.1979); *accord Sanders v. United States*, 415 F.2d 621, 631–32 (5th Cir.1969), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970).

We are aware of a number of cases following *Brasfield* in which the courts have found coercion to exist regardless of whether the disclosure was solicited by the judge or voluntarily provided by a juror. In each of these cases, however, the trial judge's awareness of the jury's division was accompanied by giving an *Allen* charge, in its pure or modified form.[13] *See, e.g., United States v. Webb*, 816 F.2d 1263 (8th Cir.1987); *United States v. Sae–Chua*, 725 F.2d 530 (9th Cir.1984); *Williams v. United States*, 338 F.2d 530 (D.C.Cir.1964). Reversal may not be necessary even where the trial judge undertakes the inquiry and thereafter follows it with an *Allen* charge, absent a showing that either incident or a

---

**11.** The juror's note read as follows:

"Your Honor, in order to avoid another lengthy and expensive trial, would it be possible to surrender my seat No. 8 to the No. 1 alternate juror to get a verdict in this case?

I have reasonable doubts in this case and the other eleven jurors are voting guilty on all four defendants. My conscious [sic] tells me otherwise and I dislike having to have a hung jury.

I would appreciate your help in my behalf. Thank you kindly.

Robert J. Larson, Juror No. 8

Must I vote with the majority, even under duress, Your Honor? Please advise."

The court then informed the juror that he could not be replaced and that he was not obliged to vote with the majority, "even under duress."

**12.** In recharging the jury, the trial judge gave the following instruction:

"Ladies and gentlemen, I do not want to emphasize one particular charge. I want you to study the entire charge, but I am going to bring to your attention one of the charges that is presently in the package of the charges I gave you orally yesterday.

I invite you to study again the entire charge, any verdict that (sic) must represent the con-

sidered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto; in other words, your verdict must be unanimous.

It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to the individual judgment.

Some of you must decide the case for yourselves, but only after an impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, you should not hesitate to remember about whether in your own views, [to] change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember, at all times that you are not partisans. You are judges of the facts as your sole interest is to seek the truth from the evidence in the case.

Ladies and gentlemen, you may again retire to consider your verdict."

**13.** *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

combination of the two was inherently coercive. *See Cornell v. Iowa,* 628 F.2d 1044 (8th Cir.1980), *cert. denied,* 449 U.S. 1126, 101 S.Ct. 944, 67 L.Ed.2d 112 (1981); *see also Butler v. United States,* 254 F.2d 875, 876 (5th Cir.1958) (trial judge's inquiry as to numerical standing on conviction or acquittal held not reversible error where it had no coercive effect on jury and did not affect substantial rights of defendant); *accord Beale v. United States,* 263 F.2d 215, 217 (5th Cir.1959).

We disagree with appellants' assertion that the instruction given to the jury by the trial judge following juror Larson's note was nothing less than a "watered-down *Allen* charge." Although the judge did encourage the jurors to consult with each other and be open to the possibility of changing their position, we do not construe the instruction as an exhortation of the minority to reexamine its views in deference to the majority, or to suggest that the majority's position is correct. Moreover, the instruction did not contain several other hallmarks of an *Allen* charge, namely that it would be expensive and time-consuming to retry the case, and that no future jury would be better suited to decide the case. In its totality the instruction in this case cannot be said to approximate an *Allen* charge or to in any other way urge a verdict.[14] In addition, no other indicia of jury coercion are present in the record. The jury deliberated some four hours after the trial court's supplementary instruction, a time period not suggestive of a coercive or pressure-filled atmosphere.

We also dismiss the argument that the court's additional charge to the jury failed to include an instruction on reasonable doubt. "[I]f the supplemental instruction admonishes as here that the jurors should not 'acquiesce' in a verdict or do violence to their consciences, no harm will be found in the trial court's failure to instruct regarding the burden of proof." *United States v. Bailey,* 468 F.2d 652, 663 (5th Cir.1972).

█ Nor do we find error in the trial judge's decision not to question the juror

regarding the "duress" he may have experienced during jury deliberations. To have done so would itself have risked reversible error, since the juror's note made clear that the pressure allegedly placed upon him resulted from discussions between the jurors and not from extraneous prejudicial information. *See* Fed.R.Evid. 606(b). The alleged harassment or intimidation of one juror by another would not be competent evidence to impeach the guilty verdict. *United States v. Casamayor,* 837 F.2d 1509, 1515 (11th Cir.1988), *cert. denied sub nom., Barker v. United States,* — U.S. ——, 109 S.Ct. 813, 102 L.Ed.2d 803 (1989); *United States v. Blackburn,* 446 F.2d 1089, 1090–91 (5th Cir.1971), *cert. denied,* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972).

For the foregoing reasons, the judgments of conviction are

AFFIRMED.

---

**14.** We do observe that although the *Allen* charge has been the subject of heated controversy, its continuing viability has been recognized by this court. *See United States v. Rey,* 811 F.2d 1453 (11th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987).