SORONDO, J.
(dissenting).
Robert J. Horvath, plaintiff, appeals the final judgment entered in favor of Anderson, Moss, Parks & Sherouse, P.A., Robert L. Parks and Albert Edward Quinton, III, the defendants, in this legal malpractice action.
As relevant to the issues before the Court, the facts of the case are the following: At the conclusion of an eight day trial the jury returned a verdict for the defendants. Immediately after, the publication of the verdict the judge ordered the polling of the jury. The first three jurors, as well as the fifth and sixth, acceded in the verdict. The fourth juror did not, initially, but ultimately did. The events which led up to that juror’s ultimate vote, or acquiescence, to the jury’s verdict, constitute the issue to be decided in this case.
After the verdict was received by the trial court, the plaintiff filed a motion for mistrial and for a new trial and the defendants filed a motion for judgment in accordance with the motions for directed verdict. In a lengthy order on post-trial motions the trial court denied the plaintiffs motions for mistrial and new trial and, “in the alternative,” granted the defendants’ motion for directed verdict.
Having thoroughly reviewed the evidence presented at trial, I conclude that the defendants’ motions for directed verdict should have been denied. In granting these motions the trial court’s order makes numerous credibility assessments which are properly within the province of the jury and irrelevant to the ruling on the directed verdict motions. The record reveals that, although apparently not believed by the trial judge, the plaintiff presented evidence which, if believed by the jury, established all of the elements of a legal malpractice action. Because my colleagues in the majority cite Alicot v. Dade County, 132 So.2d 302 (Fla. 3d DCA 1961), as authority for their decision, I presume that they also found no merit in the defendants’ motions for directed verdict. Accordingly, I will proceed to discuss the jury issue upon which the majority has decided this case.
As indicated above, the jury in this case returned a verdict. Immediately after publishing the verdict the jurors were polled. During the polling of the jury, juror # 4 dissented from the verdict. After some preliminary questioning the judge excused the jury instructing them not to discuss the case until further notice.[1] After the jury withdrew, the judge heard arguments on what to *316 do next.[2] He then brought the jury back into the courtroom for further proceedings.[3] The trial judge then sent the jurors back to the jury room and deliberations continued. Shortly thereafter the jury returned with the same verdict. The jurors were again polled and juror # 4 acceded in the verdict. Plaintiffs counsel again moved for a mistrial, which was denied.
The question presented is whether the procedure employed by the judge in questioning the individual jurors constituted reversible error. Plaintiff argues that once juror #4 receded from the verdict, the court should have stopped any further inquiry and instructed the jury to return and continue their deliberations, or declared a mistrial. The defendants respond that the trial court properly and non-coercively instructed the jurors to further deliberate, and that a unanimous verdict was properly returned by the jury *317 and confirmed in a subsequent poll of all jurors, including juror # 4.
Plaintiff relies on Brutton v. State, 632 So.2d 1080 (Fla. 4th DCA 1994). In Brutton, the Fourth District Court of Appeal reversed the defendant’s conviction because of the. trial judge’s interrogation of the jury, following one juror’s response during the polling process that the verdict was not hers. Defendants argue that Brutton is distinguishable for two reasons. First, it was a criminal case which was governed by Florida Rule of Criminal Procedure 3.450. That rule specifically provides that “If a juror dissents, the court must direct that the jury be sent back for further consideration.” The rules of civil procedure have no such provision and, consequently, there is no legal requirement that commands such action. Second, the facts of Brutton are far more egregious than those in the present case and the case is therefore not properly applied to these facts. Addressing the second argument first, I agree that the facts of Brutton are far worse than those in the present case. Nevertheless, for the reasons set forth below, I believe that the actions of the trial judge in this case were inherently coercive. As concerns the defendants’ first argument, this Court has previously stated that “the same concerns of the sanctity and secrecy of the jury room apply with as much force to civil as to criminal trials and as much implicate the rights of civil as of criminal litigants.” Eickmeyer v. Dunkin Donuts of Am., Inc., 507 So.2d 1193, 1194 (Fla. 3d DCA 1987).
The second case the plaintiff relies on is United States v. Spitz, 696 F.2d 916 (11th Cir.1983). In Spitz, the Eleventh Circuit Court of Appeals reversed a criminal defendant’s conviction for conspiracy to import marijuana. After receiving the jury’s verdict the jurors were polled. During the polling, the eighth juror indicated that the published verdict was not her own. The trial court ordered the clerk to continue polling the remaining jurors. Having completed the polling of all twelve members of the jury, the judge ordered the dissenting juror to stand and proceeded to read the approved Allen[4] charge. The jury then retired and returned a half hour later with a unanimous guilty verdict.
The Eleventh Circuit reversed and concluded that “[t]he questioning of the remaining jurors after [the juror in question] stated that the published verdict was not her verdict could have been perceived as attempted coercion of her.... The poll should have stopped as soon as the lack of unanimity was revealed.... Failure to do so was error.” Id. at 918 (citation omitted). Plaintiff urges this Court to adopt the same, per se reversible error rule adopted by the Eleventh Circuit. Like the Fourth District Court of Appeal, I do not favor such an inflexible rule. See Brutton, 632 So.2d at 1082 n. 1. Indeed, the Eleventh Circuit itself seems to have receded from the per se rule in United States v. Norton, 867 F.2d 1354, 1365-66 (11th Cir.1989)(“Reversal may not be necessary even where the trial judge undertakes the inquiry and thereafter follows it with an Allen charge, absent a showing that either incident or a combination of the two was inherently coercive.”). See also United States v. Brokemond, 959 F.2d 206 (11th Cir.1992). Additionally, the Third Circuit Court of Appeals has also rejected the Spitz per se rule in United States v. Fiorilla, 850 F.2d 172 (3d Cir.1988). Likewise, in United States v. Gambino, 951 F.2d 498, 501 (2d Cir.1991), the Second Circuit stated:
Though this Circuit has not expressly ruled on the question, the weight of authority suggests that when the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision, and not merely because the judge continued to poll the jury.
(Emphasis added). In the present case, however, it was not merely the continuation of the polling of the jury beyond juror # 4 that was coercive, rather it was the nature of the discussion that followed which was inherently coercive and which requires reversal.
When juror # 4 responded, “no,” to the court’s inquiry during the polling of the jury, *318 it was clear that the jury was not unanimous in its verdict. Perhaps surprised by the juror’s answer, the trial court asked again, “that is not your verdict?” Again juror # 4 responded, “No, it is not. I am not happy with it. I am not happy with it.” As if that were not certain enough, the judge then asked again: “Okay. You may not be happy with it, and you responded that that is not your verdict, is that right?” The juror responded, “Okay.” Having received an absolute, unequivocal answer, on three occasions, I fail to see what purpose there could possibly have been in continuing the polling of the remaining jurors. In my view, once the juror unequivocally expressed his dissent to the verdict, it was clear that the verdict was not unanimous and the judge should have immediately instructed the jurors to return to the jury room and continue their deliberations. The events which followed illustrate the danger of a prolonged inquiry.
Having polled jurors # 5 and 6, the judge excused the jury and discussed the situation with the attorneys. During that discussion, plaintiffs counsel moved for a mistrial. The court asked defense counsel for his input and he recommended that the jury simply be told to continue their deliberations. The judge denied the motion for mistrial, disregarded the recommendations of the defense and said: “I believe I should ask them if there would be any benefit served by asking them to retire to deliberate again.”[5] The jury was summoned back into the courtroom and the inquiry continued. After some general introductory remarks, the judge again addressed juror # 4: “Do I hear you to say that that is not your verdict, is that what I heard you say?” This was the fourth time the trial judge asked juror # 4 that question. More significantly, this question, by its very phrasing, suggested incredulity on the part of the judge. This is evidenced by the fact that Juror # 4 felt compelled to clarify his position. He responded: “Let me explain,” and then began to discuss the merits of the case until he was interrupted by the judge and told not to do so. At that point, for the fifth time, the judge asked again, “All I want to know is the verdict that was read, do you agree with it or not?” For the fifth time the juror noted his dissent, “Not totally.” In my judgment, the repeated asking of this question was, in itself, coercive. Having definitively answered the question four previous times, the logical inference to be drawn from the constant repetition of the same question was that the judge was not happy with the answer. Indeed, the juror’s fifth answer is, for the first time, less than absolute: “Not totally.”
The court then asked a general question, directed at all the jurors: “Would there be any benefit served if I asked you to go back into the jury room to continue your deliberations?” Juror # 3, in what appears to be some measure of frustration answered: “You have to ask him.” This reference was clearly directed at juror # 4.
The floor being open for comment, juror # 6 asked to speak. After being warned by the court not to comment on the merits of the case he said:
No, but I do think there is a problem and I may be wrong, and maybe my other peers will tell me, but [juror # 4] does not understand the terminology of the case nor does he- understand the ramifications of the case. We have tried to go over it and I do not — I think the problem is he does not comprehend what has happened in this courtroom.
Thus, in open court and in the presence of all those assembled, juror # 4 was humiliated by a fellow juror who suggested that the embattled juror was unable to understand the terminology or ramifications of the case and that he lacked the intelligence to understand what had happened during the eight days of trial. The suggestion that the atmosphere in the courtroom was not hostile and coercive towards juror # 4 is, in my judgment, pure fiction.
The trial judge then again asked the jury: “Would there be an [sic] useful purpose served if I asked you all to go back into the jury room to see whether you can reach a *319 unanimous verdict?” Again a very frustrated juror # 3 responded: “You have to ask him.” It was then that juror # 4 responded: “I would say yes, if we talk about the point I’m trying to emphasize.” Very shortly thereafter the jury returned with the same verdict and a polling of the jurors revealed that all assented to the verdict.
Most citizens are reluctant to serve on juries. Aside from the intrusion into their busy personal lives, jury duty places people in a position of having to make difficult decisions on complex matters which will obviously have significant consequences on the lives of the litigants. Additionally, the courtroom environment itself is often cold and intimidating. Although it is clear to all who serve that their decision will ultimately be made public, there is solace to be found in the understanding that their deliberations, i.e., the expression of their individual, personal opinions and thoughts, although subject to criticism from their fellow jurors, will remain private. In addition to the coercive nature of the court’s inquiry, the sanctity of the jury’s deliberative privacy was violated in this case when juror # 6, in response to the judge’s invitation to speak, humiliated juror # 4 by publicly exposing what he (juror # 6) considered to be the inadequacy of juror #4’s perceptions. In Scoggins v. State, 24 Fla. L. Weekly S43, 726 So.2d 762 (Fla.1999), the Supreme Court of Florida stated:
The deliberations of a jury are extremely sensitive, and nothing should be done by the trial judge to directly or indirectly influence a jury’s deliberations, especially in a way that might divide or cast one juror or group of jurors against the others. Even ambiguous and subtle influences upon a minority quantified or identified by number can disturb the sensitive process by which jurors attempt to decide the case and resolve their differences. It is one thing for there to be a division that may occur and change naturally during the course of confidential deliberations. It is a different thing to identify and focus on the division in open court, outside the give and take exchange among jurors during their confidential proceedings. To permit otherwise would risk tainting the outcome of the trial by shifting the jury’s focus from the law and evidence before it to the judge’s motivation in inquiring into the status of a verdict.
Id. at 766-67 (emphasis added). These words were directed at a judge’s efforts to determine the numerical division of the jury after two hours and forty minutes of deliberations, in what the judge apparently believed to be a rather simple case. The facts in this case are far more egregious.
I do not suggest that the trial judge solicited juror # 6’s response. Indeed, the transcript suggests that the court was surprised by the comment and tried to communicate to the jury that juror # 4 had a right to his opinion. ' Nevertheless, the court’s invitation for free, uncensored comments from what was obviously a divided jury was an invitation to disaster. The conclusion is inescapable that juror # 4 was publicly embarrassed and humiliated into abandoning his doubts about the propriety of the verdict.
The majority relies on Alicot for its decision. That case is distinguishable. In Ali-cot, the trial jury returned a verdict and was subsequently polled. During polling, one of the jurors responded: “We voted by a majority. I didn’t agree with the vote.” 132 So.2d at 302. A brief inquiry of the foreman revealed that the jurors, unable to agree on the value of each of the parcels of land in question, settled for a majority vote on their values. The court asked the foreman: “Did all twelve of you agree as to the amounts that you brought in as set forth in your verdict?” The foreman responded: “Not at all times.” Id. at 303. He went on to say that it was possible that they had not understood what the court meant by “reaching a unanimous verdict.” Id. He indicated that further deliberations would be helpful. The judge sent them back for further deliberations and the jury ultimately returned an identical, unanimous verdict.
I note, first, that the exchange between the trial judge and jury in Alicot and the exchange in the present ease are totally different. In Alicot, the dissenting juror was not specifically singled out for questioning. The foreman acknowledged that what the dissenting juror said was accurate, and was what *320 the jury as a whole had decided to do. It was therefore implicit in the explanation that more than one juror.could have dissented on the same ground because it was, in fact, a majority vote and not a unanimous one on the issue of value. Accordingly, the dissenting juror would not have felt coerced because the exchange between the foreman and the judge established that he was in the mainstream of the jury’s thought process. Unlike this case, there is absolutely nothing coercive in the dialogue between judge and jury in Alicot
In distinguishing Alicot, the following language from that opinion needs to be ' addressed:
[I]t seems that even where there is a question as to the propriety of the process adopted in arriving at the verdict, a subsequent polling of the jury and their separate answers relieves the verdict from all objection.
Id. at 303. Based on this language the argument has been made that the present jury’s successful polling after it returned the same verdict the second time “relieve[d] the verdict from all objection.” Such a concept makes no sense in a case where there is an allegation of coercion. If the process employed by the trial court in its inquiry of the jury is directly (as in Brutton) or indirectly (as in this case) coercive, whatever happens thereafter is tainted by the- coercive influence. Thus, to say that the verdict is relieved from all objection because the secondary polling of the jury in this case revealed no dissenting juror, is to say that successful coercion of jurors will be rewarded. This cannot possibly be the law. This language from Alicot, although relevant to a case like Alicot which involves jury confusion, is inapplicable when analyzing a case of jury coercion.
For the reasons set forth above, I believe the trial judge abused his discretion by denying the plaintiffs motions for mistrial and new trial. I would reverse that decision and remand for a new trial. Accordingly, I respectfully dissent.

. THE COURT: ... Is there a request to poll the jury?
*316 MR. HERMAN: Yes.
THE COURT: All right, there’s been a request to poll the members of the jury, so when your name is called by me, please respond either yes, that that is my verdict that was read, or no, that is not my verdict that was read. [Juror # 1]?
[JUROR # 1]: Yes.
THE COURT: [Juror # 2]?
[JUROR #2]: Yes.
THE COURT: [Juror # 3]?
[JUROR # 3]: Yes.
THE COURT: [Juror # 4]?
[JUROR #4]: No.
THE COURT: That is not your verdict?
[JUROR # 4]: No, it is not. I am not happy with it. I am not happy with it.
THE COURT: Okay. You may not be happy with it, and you responded that that is not your verdict, is that right?
[JUROR #4]: Okay.
THE COURT: [Juror # 5]?
[JUROR # 5]: Yes.
THE COURT: [Juror # 6]?
[JUROR #6]: Yes.
THE COURT: Thank-you. May I see the lawyers — Let me ask you to all go back to the jury room for a second or two longer. Thank you. Please don’t discuss the case at this time. (Thereupon, the jury left the courtroom, after which the following proceedings were had:)

. This discussion was conducted immediately after the jurors were excused. While making legal argument to the court, plaintiff's counsel noted that the jurors were yelling at juror # 4. In response to counsel's statement the trial judge responded, "All right, that's fine. I hear you comment.” Defense counsel did not deny or otherwise challenge plaintiff's counsel’s comment.

. (Thereupon, the jury entered the courtroom, after which the following proceedings were had:)
THE COURT: All right, welcome back again, members of the jury. Please come right in and be seated if you will. Everyone else in the courtroom may be seated. I’m going to be directing my remarks to members of the jury. I would like for you to try to respond first and you can first do that through the foreman and if not, then in an orderly manner. My first question to you, members of the jury, is, and I again in that include [juror # 4], of course. I understand from what I just heard before that you went back into the jury while we, the lawyers and judge, conferred.
[Juror # 4], do I hear you to say that that is not your verdict, is that what I heard you say?
[JUROR # 4]: Let me explain. I’m saying and I can say in truth I am responding and they are trying to tell me that a derivative claim and a direct claim is not the same thing—
THE COURT: I don't want to know about the merits. All I want to know is the verdict that was read, do you agree with it or not?
[JUROR # 4]: Not totally.
THE COURT: When you say not totally, I'm going to ask you all of this, would there be any benefit served if I asked you to go back into the jury room to continue your deliberations? I'm asking you whether there would be any benefit that could be served?
[JUROR # 3j: You have to ask him'—
[JUROR # 6]: Yes. Can I just say or make a statement?
THE COURT: Of course, but I don't want to go into the merits.
[JUROR # 6]: No, but I do think there is a problem and I may be wrong, and maybe my other peers will tell me, but [juror # 4] does not understand the terminology of the case nor does he understand the ramifications of the case. We have tried to go over it and I do not — I think the problem is he does not comprehend what has happened in this courtroom.
THE COURT: Okay, that’s okay. That may be your view, but [juror # 4] is a member of the jury and I have to hear from him. I appreciate what you just told me and certainly anybody else that wants to bring up anything, but not the merits of the case. My question is, would there be an [sic] useful purpose served if I asked you all to go back into the jury room to see whether you can reach a unanimous verdict?
[JUROR # 3]: You have to ask him.
THE COURT: [Juror # 4], would there be any useful purpose served if I asked you all, all the jurors to go back into the jury room to redeli-berate and rediscuss and see if you could reach a unanimous verdict?
[JUROR #4]: I would say yes, if we talk about the point I'm trying to emphasize—

. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

. I note that the jury had only deliberated for two hours in the wake of this eight day trial. Accordingly, the court’s proposed question was premature. After such brief deliberations in such a lengthy trial continued deliberations were appropriate.